EL PUEBLO, DEMANDANTE Y APELADO, *v.* IZQUIERDO, ACUSADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Mayagüez en causa por delito de asesinato en primer grado.

No. 1103.—Resuelto en junio 14, 1917.

ASESINATO EN PRIMER GRADO—MUERTE AL PERPETRARSE UN ESCALAMIENTO—PREMEDITACIÓN Y DELIBERACIÓN—ACUSACIÓN.—Bajo una acusación en que se imputa al acusado el hecho de haber dado muerte ilegal a un ser humano, voluntariamente y con malicia premeditada y propósito firme y deliberado de causarla, demostrando tener un corazón pervertido y maligno, puede probarse que la muerte se perpetró al cometerse un delito de escalamiento.

ID.—SUFICIENCIA DE LA PRUEBA.—El acusado alegó que la prueba era insuficiente, y examinada dicha prueba *se resolvió:* que no debía alterarse el veredicto del jurado.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. Antonio Trujillo Güil.*

Abogado del apelado: *Sr. Salvador Mestre, Fiscal.*

EL JUEZ ASOCIADO SR. DEL TORO, emitió la opinión del tribunal.

El presente es un caso en el cual se impuso al acusado la pena de muerte. La acusación, en lo pertinente, dice así:

"El citado acusado Rufino Izquierdo, allá en horas comprendidas en la noche del día 7 al 8 de agosto de 1915, y en el barrio de Colombia del Municipio de Mayagüez, P. R., territorio de la Corte de Distrito de Mayagüez, P. R., allí y entonces, ilegal y voluntariamente, y con malicia premeditada y propósito firme y deliberado, y demostrando tener un corazón maligno y pervertido, dió muerte al niño Ramón Mercado y Carbonell, conocido por Ramón Valentín que era un ser humano, con un garrote, palo grueso, infiriéndole con dicho instrumento una herida contusa en la región malar derecha, contusión que produjo una fractura en el hueso maxilar superior, base del cráneo, que interesaba todo el cuerpo del hueso esfenoide y que produjo una profusa hemorragia que fué causa de la muerte ilegal e instantánea del referido Ramón Mercado Carbonell conocido por Ramón Valentín."

El acusado alegó su inocencia. Se celebró el juicio por jurado y éste, después de oir las alegaciones, las pruebas, las

instrucciones de la corte y los informes de las partes, rindió
su veredicto declarando culpable al acusado del delito de
asesinato en primer grado.    La corte, en su oportunidad, dictó
sentencia imponiendo al convicto la última pena.

La prueba fué circunstancial y tendió a demostrar que el
crimen se había cometido al perpetrarse un delito de escala-
miento en primer grado.    La corte, entre otras, dió las si-
guientes instrucciones al jurado:

"Existen pues, señores del jurado, tres clases de asesinato en
primer grado: el que se perpetra por medio de acecho, veneno o
tortura; ustedes no tienen que ver con esa clase de asesinato porque
no hay evidencia ninguna en este caso que tienda a establecer que
la muerte fué causada por medio de acecho, veneno o tortura; se-
gundo, el que ocurre al cometer o intentar cometer un delito de in-
cendio, violación, escalamiento, robo o mutilación; y la tercera clase
es el perpetrado en cualquiera otra forma voluntaria, deliberada y
premeditadamente.    Con lo que tienen que ver ustedes, señores del
jurado, es la segunda clase de asesinato en primer grado, el que ocu-
rre al cometer o intentar cometer un delito de escalamiento o de
robo; con la tercera clase no tienen que ver porque aquí no se ha
introducido evidencia de la premeditada y deliberada intención de
causar la muerte, que este acusado había prepensado, que había pre-
parado la comisión de esta muerte.

"La corte instruye a los señores del jurado, que cuando la muerte
es consumada al perpetrarse o intentarse la perpetración de algún
robo o escalamiento, entonces existe prueba concluyente de la pre-
meditación, y de deliberación por parte del matador, y si ha sido
consumada la muerte voluntaria, deliberada y premeditadamente es
contestado por el propio código y el jurado no podrá menos que
optar por declarar al acusado culpable de asesinato en primer grado."

El apelante alega que la prueba fué insuficiente y que hubo
una variación tal entre la acusación y la prueba que implica
la indefensión del acusado, y por ambos motivos, o por cual-
quiera de ellos, solicita la revocación de la sentencia apelada.
Estudiaremos primero la variación y luego la prueba.

En efecto, la acusación imputa a Rufino Izquierdo la
muerte ilegal del niño Ramón Mercado, cometida volunta-
riamente y con malicia premeditada y propósito firme y de-

liberado, demostrando tener un corazón pervertido y maligno, y la prueba tiende a demostrar que el asesinato se perpetró al cometerse un delito de escalamiento. ¿Constituye esto una variación fundamental que implique indefensión para el acusado? ¿Es necesario cuando se trata de un asesinato cometido al perpetrar un delito de incendio, violación, escalamiento, robo o mutilación, que se especifique así en el acta acusatoria? ¿Son erróneas las instrucciones transcritas? Existe abundante jurisprudencia sobre la materia.

En el caso de *People* v. *Giblin,* 4 L. R. A. 757, el Juez Gray, de la Corte de Apelaciones de Nueva York, al emitir la opinión del tribunal, se expresó así:

"La acusación está redactada en la forma de la ley común y en uno de sus cargos imputa que la muerte se había cometido voluntaria y criminalmente y con malicia premeditada. El acusado alegó que tal acusación no era suficiente para declararlo culpable de asesinato en primer grado, cometido mientras perpetraba un asalto criminal en la persona de Valentina Goelz. Sostiene que el delito está definido por la ley en forma alternativa, consistiendo en actos distintos, y por tanto, que la acusación debió expresar las circunstancias constitutivas de la ofensa de acuerdo con el tercer proviso de la sección 183 del Código Penal, que califica la muerte de un ser humano como constitutiva de asesinato en primer grado, cuando se cometiere sin el designio de matar, por una persona ocupada en la comisión de, o en el intento de cometer, un delito grave.

"La objeción que se hace a la acusación es insostenible. Bajo ella se puede sostener una convicción de asesinato en primer grado por medio de prueba de que la muerte se realizó en la perpetración de un delito grave. *People* v. *Conroy,* 97 N. Y. 62; *People* v. *Villett,* 102 N. Y. 254, 2 Cent. Rep. 890.

"Si la acusación contiene una exposición llana y completa de los hechos constitutivos del delito, y la prueba con respecto a la forma en que fué perpetrado lo coloca bajo una de las definiciones del estatuto sobre asesinato en primer grado, se cumplen suficientemente las exigencias de la ley." 4 L. R. A. 758.

La Corte Suprema de Iowa, en *State* v. *Johnson,* reportado en 34 N. W. Rep. 177, dice:

"La acusación contiene dos cargos; en cada uno dé ellos se alega la premeditación, deliberación y otros elementos necesarios para constituir el delito de asesinato en primer grado. El segundo cargo alega además que la muerte se perpetró por medio de acecho. En ninguno de los cargos se expresa que el crimen se realizó al perpetrarse un incendio malicioso, violación, robo o escalamiento. La corte instruyó al jurado en el sentido de que si ellos encontraban que la muerte fué ocasionada al perpetrarse un robo, era asesinato en primer grado. El abogado insistió en que, a falta de una alegación en la acusación expresando que la muerte tuvo lugar al perpetrarse un robo, el que surja tal hecho no autoriza un veredicto de asesinato en primer grado. Nuestra opinion es diferente. La acusación alega hechos suficientes para demostrar que la muerte ocurrió en circunstancias tales que constituyen un asesinato en primer grado. No era necesario alegar los hechos y circunstancias que rodearon el crimen. La acusación suficientemente sostiene la prueba de los hechos constitutivos del asesinato en primer grado, y bajo ella podía demostrarse que el crimen se había cometido al perpetrarse un robo." 34 N. W. R. 177, 181.

La Corte de Apelaciones en materia criminal del Estado de Texas, en *Wilkins* v. *State,* 34 S. W. Rep. 627, dijo:

"Se ataca la instrucción de la corte porque indicó al jurado que 'todo asesinato cometido con malicia expresa es asesinato en primer grado,' y 'que la ley declara que todo asesinato cometido en la perpetración o tentativa de perpetrar robo, es asesinato en primer grado.'

"La última manifestación se ataca porque la acusación en este caso solamente imputa el hecho del asesinato con malicia premeditada, y ninguna parte de ella imputa el asesinato al cometer o intentar cometer el delito de robo. La alegación del apelante en ambos casos ha sido decidida en contra suya. Véase *Sharpe* v. *State,* 17 Tex. App. 486; *Giles* v. *State,* 23 Tex. App. 281, 4 S. W. 886. No hubo error al definir el robo, porque está establecido que bajo una acusación de asesinato con malicia premeditada, el acusado puede ser convicto de asesinato en primer grado si se cometió en la perpetración o tentativa de perpetrar robo. Era deber de la corte definir lo que se entiende por robo." 34 S. W. R. 627, 628.

La misma doctrina se establece por la Corte Suprema de Missouri en los casos de *State* v. *Foster,* 38 S. W. Rep. 721, y *State* v. *Meyers,* 12 S. W. Rep. 516. La Corte Suprema de Arkansas, por el contrario, después de haberla aplicado en

*Rayburn* v. *State,* 63 S. W. Rep. 356, reconsideró luego su decisión desestimándola. 63 S. W. Rep. 359.

Los razonamientos de las cortes de Nueva York, Iowa, Texas y Missouri, son convincentes y siendo nuestra ley penal similar a la que rige en dichos Estados, deben aplicarse para resolver la cuestión suscitada en este caso.

Examinemos la prueba. Una noche, al regresar a su casa, a eso de las dos o las tres de la madrugada, Julián Valentín encontró a su mujer, María Santiago, tendida en el suelo, muerta, y al niño que con ellos vivía, Ramón Mercado, bañado en sangre, en su cama, y también muerto. Valentín salió en busca de auxilio, y regresó con su convecino Simón Villar. Este le aconsejó que no tocara nada y que diera cuenta a la justicia. Así lo hicieron. Llegó la policía, luego el Fiscal y se inició esta causa. El médico que practicó la autopsia de Ramón Mercado, dijo: "era un niño trigueñito, como de siete a ocho años, de constitución endeble. * * * presentaba dos heridas contusas en la cara, * * * y una hemorragia bastante grande en la parte exterior; después, cuando practiqué la autopsia, encontré que el hueso malar estaba totalmente destruído, estaba fracturado, había multitud de esquirlas ahí completamente desprendidas, adheridas a los tejidos blandos; más adentro encontré que el hueso maxilar estaba destrozado, el temporal estaba también fracturado y la base cigomática del temporal estaba también fracturada, desprendida; más profundamente encontramos una fractura, extensa en toda la base del cráneo que cogía el esfenoide en toda su extensión y al final del esfenoide una gran cantidad, una gran masa de sangre coagulada.''

¿Quién ocasionó la muerte de Ramón Mercado? La prueba en cuanto a este extremo es toda circunstancial.

Julián Valentín vivía en las afueras de Mayagüez en un sitio denominado Colombia. Se dedicaba al negocio de carros de carga tirados por caballos. Rufino Izquierdo traba-

jaba con él desde unos días con anterioridad al suceso. Este ocurrió un sábado por la noche. Al atardecer de ese sábado, Julián y Rufino regresaron a la casa del primero. Julián Valentín declaró en el acto de la vista, en resumen, que una vez que llegó con Izquierdo a su casa, en donde estaban su mujer y el niño, dijo a aquélla que le diera comida a Rufino; luego se bañó y vistió y su mujer le sirvió la comida y lo peinó; que salió de nuevo acompañado de Izquierdo con quien se dirigió a la casa mercantil de Esmoris para arreglar las cuentas de la semana; que quiso entregarle a Rufino un peso, pero éste se limitó a recibir una peseta y a tomar su libreta para liquidar su cuenta luego, y que se separaron entonces. Valentín estuvo en el teatro, luego jugando lotería, y a su regreso se encontró con la escena que dejamos descrita. Ya sabemos lo que hizo. Estando en su casa con su convecino Villar, notó que le faltaban un "revólver, unas pulseras, unos aros y un relojito chiquito," prendas que se encontraron al día siguiente cerca de la casa de Rufino Izquierdo, envueltas en una camiseta de éste. Esta circunstancia relacionó a Izquierdo con el crimen y acto seguido se dirigió la investigación contra él.

Izquierdo declaró primero ante el Fiscal y luego, como su propio testigo, en el acto de la vista. Dijo, en resumen, que trabajaba con Julián Valentín y fué a la casa de éste, como de costumbre, a dejar los caballos de los carros; que en la casa estaban la mujer y el niño; que la mujer después de servirle la comida, se puso a peinar a Valentín y como le tirara duro, surgió un disgusto, que continuó con motivo de la venta de unos cerdos. Que Valentín agredió con el puño a su mujer y ésta cayó al suelo. Que el niño gritó llamando a su mamá y entonces Valentín le dió con un palo. Que hecho esto, Valentín le pidió que no lo descubriera y al efecto le entregó las prendas para que las tirara o hiciera de ellas lo que quisiera, a fin de que la justicia creyera que se trataba de un robo. Que

convino en ello y salió con él y fueron a casa de Esmoris a arreglar cuentas. Acompañó a Valentín hasta el teatro y se retiró a dormir, acostándose a eso de las diez y media.

La declaración de Izquierdo quedó contradicha por el resto de la prueba así: Por Julián Valentín, cuya declaración dejamos extractada; por Francisca Toro, costurera que estuvo en la casa de Julián Valentín la noche del suceso poco tiempo después que salieron de ella Valentín y Rufino y encontró vivos y sanos a la mujer y al niño y recibió de la mujer cierta cantidad de dinero; por Pedro Mangual, Anastasio Guzmán, y Anastasio Soler, quienes vieron caminar a Izquierdo a eso de las diez o diez y media de la noche por un sitio por donde podía irse al barrio Colombia, hecho que negó en su declaración Izquierdo; por Dionisio García, que entre nueve y media y diez, vió ir a Rufino Izquierdo para Colombia, hecho que también negó en su declaración Izquierdo; por Pascual Soto, que asegura que Rufino no fué a dormir a su casa la noche del suceso, y por Nicasio Oliviery, que le vió como a las cinco y media de la mañana del domingo siguiente a la noche del sábado en que se perpetró el crimen tomando café en un chinchorro. La manga del gabán del acusado se encontró manchada de sangre humana.

Esa es brevísimamente resumida, la evidencia practicada. El jurado la estimó suficiente. Creyó a Julián Valentín y juzgó que la historia referida por Izquierdo no era cierta. La muerte violenta del niño Mercado quedó comprobada cumplidamente por medio de prueba directa, y por prueba indiciaria la culpabilidad del acusado. Las manchas de sangre y sobretodo las prendas sustraídas de la casa de Valentín, constituyen una acusación terrible contra Izquierdo. La declaración de éste ante el jurado ocupa nueve páginas de la transcripción y si aún leyéndola se puede notar su vacilación, sus contradicciones, y lo inverosímil de su narración, no es extraño que el jurado que la escuchó de sus labios, la desechara.

totalmente.   Por el   contrario la declaración de Valentín es
lógica y quedó corroborada por todo el resto de la prueba con
excepción de la declaración del acusado.   El niño que fué
asesinado vivía con Valentín y con su mujer desde hacían va-
rios años.   Cuando Valentín se unió a María Santiago, nada
tenía y trabajando ambos prosperó llegando a adquirir tres
casitas.   Ella era una mujer hacendosa y se llevaba bien, se-
gún su convecino Villar, con su marido.

Bajo tales circunstancias, no debe ni puede alterarse el
veredicto del jurado.   Procede la confirmación de la senten-
cia apelada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Aso-
ciados Wolf, Aldrey y Hutchison.