El Pueblo de Puerto Rico, demandante y apelado, *v.* Krenly Olivencia y Fernando Olivencia, acusados y apelantes.

Núm. 7480.—*Sometido:* Marzo 21, 1939. *Resuelto:* Mayo 31, 1939.

*Amador Ramírez Silva* y *Pedro Baigés Gómez*, abogados de los apelantes; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

La acusación formulada por el fiscal del distrito en este caso lo fué por un delito de asesinato en primer grado. En lo pertinente, lee así:

"Los referidos acusados, Krenly Olivencia y Fernando Olivencia allá en la noche del día 30 de noviembre de 1936 para amanecer el día 1 de diciembre 1936, en Mayagüez, P. R., que forma parte del

Distrito Judicial del mismo nombre, de una manera ilegal, y voluntaria, con malicia premeditada, expresa y tácita y con el firme y deliberado propósito de matar y en ocasión de intentarse robo y demostrando tener un corazón pervertido y maligno, dieron muerte ilegal, al ser humano Claudio Vientós Hernández también conocido por Claudio Hernández, al cual lo acometieron y agredieron con una pieza de madera a saber: un balaustre de madera del país que es un instrumento contundente, infiriéndole una herida de carácter grave en la cabeza y a consecuencia de dicha herida recibida, falleció el mencionado Claudio Vientós Hernández c/p Claudio Hernández en la madrugada del día 1 de diciembre de 1936 allí y entonces, y que tal herida fué inferida por los acusados Krenly Olivencia y Fernando Olivencia actuando juntos al hoy interfecto Claudio Vientós Hernández c/p Claudio Hernández, con la intención de matarlo.''

Radicada dicha acusación en marzo 9, 1937, se le leyó a los acusados el 18 del mismo mes, entregándoseles copia y concediéndoseles cinco días para contestarla, al cabo de los cuales comparecieron por su abogado e hicieron la alegación de no culpables solicitando juicio por jurado.

El 14 de junio siguiente comenzó a celebrarse el juicio que continuó el quince, el diez y seis, el diez y siete y terminó el diez y ocho, rindiendo el jurado su veredicto declarando a ambos acusados culpables de asesinato en segundo grado, solicitando clemencia del juez al imponer la pena.

Fijado el 23 de junio, 1937, para el pronunciamiento de la sentencia, se suspendió el acto a petición de los acusados concediéndoseles hasta el treinta para presentar una moción de nuevo juicio, término que fué luego extendido a ruego de los mismos.

El 15 de julio siguiente quedó radicada la moción. Se opuso el fiscal por escrito. Se oyó a ambas partes el cinco de agosto y el seis la corte la declaró sin lugar, dictando sentencia el dos de septiembre imponiendo a cada uno de los convictos la pena de veinte años de presidio con trabajos forzados.

El propio dos de septiembre de 1937 Krenly y Fernando Olivencia apelaron para ante este tribunal de la orden

negando el nuevo juicio y de la sentencia, quedando radicados finalmente los autos en la secretaría de este tribunal en noviembre 29, 1938. En enero 9, 1939, archivaron su alegato los apelantes y en marzo 18 siguiente su informe el fiscal. La vista del recurso se celebró el veinte y uno de marzo último.

Trece errores se señalan como cometidos por la corte, en relación con la práctica de la evidencia los once primeros. Por el doce se sostiene que erró la corte al apreciar la prueba y por el trece que erró al declarar sin lugar la moción de nuevo juicio.

██ Tras un estudio cuidadoso de los autos parece conveniente comenzar por exponer la prueba a los efectos de resolver el duodécimo de los errores señalados y entonces entrar en la consideración de los primeros once errores cuya resolución lleva consigo la del décimotercero porque para solicitar el nuevo juicio se adujeron los mismos fundamentos que ahora se aducen para pedir la revocación de la sentencia.

El primer documento que presentó El Pueblo por su fiscal fué la certificación de inscripción de la muerte de Claudio Hernández, soltero, de treinta y ocho años de edad, natural de San Sebastián, residente en la calle Tamarindo esquina a la de San Ignacio, de Mayagüez, fallecido en dicha ciudad en diciembre 1, 1936, a consecuencia de hemorragia cerebral.

Seguidamente declaró el Doctor Pedro Perea Fajardo, médico-cirujano que practicó la autopsia del cadáver. Observó primero la masa encefálica y el pelo envueltos en sangre. Luego examinó las heridas. Presentaba dos contusas en la región occipital y una en la parietal. Levantó el cuero cabelludo y encontró que el hueso occipital estaba dividido en ocho o diez heridas y el parietal fracturado hacia la base del cráneo. Hubo gran hemorragia por la boca y la nariz. La causa directa de la muerte fué la hemorragia producida por la lesión cerebral.

Llamado a la silla de testigos Andrés A. Vélez, policía insular, refirió que en la noche del treinta de noviembre a

amanecer el primero de diciembre se encontraba en el cuartel durmiendo cuando fué llamado por el retén, y como consecuencia "saqué la 'Police Patrol' y me dirigí al barrio de la Salud de Mayagüez, calle 'Jagüita' esquina a 'San Ignacio' y encontré a Claudio Vientós Hernández conocido por Claudio Hernández boca abajo en un charco de sangre con una herida en la cabeza....como a cinco pies de distancia encontré un balaustre de madera hendido por la mitad lleno de sangre y con un mechón de pelo pegado. Le pegué la 'Patrol' para alumbrarlo y tenía el bolsillo trasero derecho vuelto al revés, y el izquierdo un poco sacado. Entonces llamé al guardia de la 'Salud' y vine donde el fiscal, le expliqué lo sucedido y él me ordenó que lo trasladara a la capilla del cementerio. Antes de llevarlo a la capilla tenía ciento sesenta y cuatro pesos y le encontré un pañuelo blanco con unas rayas verdes ensangrentado; unas gafas, una peinilla y una pluma fuente. . . . En el bolsillo del gabán de adentro. También le encontré una libreta ensangrentada. . . ."

Se le presentan los objetos a que se refiere en su declaración y los reconoce como los mismos que ocupara y entregara al fiscal. Éste los introduce en evidencia y quedan admitidos por la corte, sin objeción.

Acreditado de tal modo el cuerpo del delito, continúa El Pueblo por su fiscal introduciendo su evidencia en relación con los autores del crimen.

Matildo Colón Rivera dijo que regresando la noche del 30 de noviembre al 1 de diciembre de 1936 de "un velorio de un cumpleaños en casa de un hermano", que se celebraba en el barrio de Juan Alonso de Mayagüez, como a la una y pico, vió en la entrada de la calle San Ignacio esquina a la de Jagüita dos jóvenes parados. Conoció a uno de ellos, Krenly Olivencia, el acusado, que estaba vestido de blanco. El otro joven "era bastante grueso y no muy alto. Trigueño." Tenía "una camisa cardenal o bien sea color vino."

Siguió el testigo caminando y al llegar "a la esquina de la calle San Ignacio (en) que está el almacén de Juan Mari,

encontramos a Claudio Vientós Hernández", saludándolo. Preguntado "¿Hacia dónde iba Claudio Vientós?" contestó: "Él se acercaba a los muchachos éstos."

La testigo Ana Luisa Torres Pratts que era otra de las personas que con Colón Rivera regresaba a la ciudad del velorio, corrobora la declaración de Rivera.

Hilergio del Toro fué el siguiente testigo. Dijo que pasó por Mayagüez solo en un automóvil la noche del suceso. Iba por el barrio de la Salud y "al llegar por la calle de la residencia del doctor Guzmán yo sentí como caer un palo, a la izquierda, y entonces miré y entonces vi como el brillo de un palo, como cuando un policía tira un palo al suelo, y entonces miré hacia la izquierda y vi como a 30 ó 35 pies que una persona corría hacia un lado y otra hacia otro lado, y a una persona que trataba como de levantarse del suelo y yo seguí para acá y seguí viaje para Cabo Rojo."

Uno de los que corría estaba vestido de blanco o crudo, no pudo fijarse bien, el otro en cuerpo de camisa. Según sus cálculos sería como la una o una y cuarto.

Llamado Carlos Ayala Pagán declaró que se encontraba esa noche en el "Club Mayagüezano". Allí estuvo como hasta la una más o menos. A esa hora se dirigía hacia la casa de un vecino por la Salud. Subió por la calle San Rafael y llegó a la del Tamarindo o Jagüita, esquina a San Ignacio y al pasar sintió que hablaban, se fijó y "a la esquina, a la derecha", vió tres personas. "Uno de los que estaban allí era delgado, grueso (sic), bajito, vestido de *brown* oscuro"; otro "era trigueño, más alto y más delgado", vestido de camisa a rayas, y "el otro miraba así al frente de los dos que estaban para allá y daban la espalda por donde yo tenía que pasar; ése era blanco, alto, delgado," vestido de blanco, se le pareció a Krenly Olivencia por el traje que vestía y por la barbilla del lado derecho de la cara. Cuando salió del Club y se dirigía hacia la calle de Jagüita se encontró con Matildo Colón Rivera.

Octavio Torres que trabajaba en el café-restaurant "La Greca" y que dijo conocer a los acusados, declaró que vió a éstos en el café entre siete y ocho de la noche del treinta de noviembre de 1936. Krenly le pidió una cuarta de ron, le dió diez centavos y le dijo que le abonaría luego los cinco que faltaban. Volvió como a las dos y media de la madrugada acompañado de Fernando y Felipe Olivencia. Se sentaron en una mesa y pidieron de comer. Pagó Krenly con un billete de cinco pesos que el testigo llevó a la caja para cambiarlo, cobrar y darle la vuelta.

Llamado el dueño de "La Greca" Miguel Angel Díaz manifestó que recogió el dinero, lo envolvió en un papel y marcó el paquete "Diario del lunes y martes de 'La Greca'." El dinero estuvo en su poder hasta la tarde del miércoles en que lo depositó en el "Royal". Antes sacó del paquete y entregó a un policía cuatro billetes de cinco pesos.

Volvió a declarar Andrés A. Vélez y dijo que el 4 de diciembre de 1936 "estando yo en la fiscalía como a las doce y cuarto más o menos, estaba declarando el testigo Torres y fuí ordenado por el fiscal de trasladarme al establecimiento 'La Greca' a ocupar los billetes de cinco pesos que hubiera en la registradora y entre los diarios de lunes y martes que hubiera. Al llegar a La Greca le pregunté que si había depositado el dinero de esa semana. . . . Entonces Miguel Angel Díaz me entregó la llavecita del cofre, y yo mismo abrí el cofre. . . . Un cofrecito de lata, cuadrado, cerrado y saqué varios paquetes que había dentro de él, que cada paquete estaba marcado y saqué el paquete que tenía escrito 'Lunes y martes—Noche'. Entonces lo abrimos y había cuatro billetes de a cinco pesos. . . . Los ocupé y dí un recibo por ellos a Miguel Ángel Díaz. . . . Vine a fiscalía y delante del fiscal los marqué 'A. V. I. P.' y los metí en un sobre entregándoselos al fiscal."

Preguntado "¿Cuál es el número de serie de los cuatro billetes?", contestó, consultando una nota que dijo que tomó al entregarlos al fiscal, "El primero 'D25092567A'; el se-

gundo 'V61472923A'; el tercero, 'C39523676A', y el cuarto 'C11481006A'.''

Preguntado si cuando ocupó los billetes notó algo de particular en ellos contestó: "Sí señor, uno de ellos estaba manchado con una manchita roja en una esquina.''

Ofreció el fiscal en evidencia los billetes y la corte los admitió con la oposición de la defensa.

Procedió entonces la acusación a identificar por medio del testigo la ropa del interfecto y una vez identificada la ofreció en evidencia. Fué también admitida con la objeción de la defensa.

Llamó el fiscal al perito Rafael del Valle Sárraga, químico bacteriólogo, director del Laboratorio del Departamento de Sanidad Insular. Su declaración es larga y detallada. Refiriéndose al pañuelo y a los billetes ocupados y sometidos a su examen, se expresó, en parte, como sigue:

"Pues bien, el pañuelo estaba manchado. Cuando se le entregó al perito ese pañuelo no se sabía de qué naturaleza era esa mancha. El perito tuvo entonces que realizar un trabajo químico, físico y biológico para con esos tres datos llegar a alguna conclusión. Procedí en primer término al examen físico por medio del espectroscopio y con la aislación de partes expectrales llegué a la conclusión de que en esa manchita existía hemoglobina. Procedí al examen químico y por los procesos ordinarios identifiqué la sueroalbúmina, la globulina y la pequeña cantidad de azúcar que existe en la sangre normal; sometí entonces la mancha del pañuelo a un examen microscópico y a través de ese examen identifiqué la presencia de glóbulos rojos y de glóbulos blancos. Con esos datos ya el perito podía asegurar que esa mancha era de sangre, pero todavía no podía apreciar si esa sangre era humana o procedente de algún animal. Recurrí entonces a los métodos biológicos. El método biológico consiste en someter un lavado de la mancha sospechosa a la acción de ciertos sueros que son específicos. Por medio de esos sueros, el suero antihumano conseguí reacciones características e incontrastables de que la sangre del pañuelo era sangre humana. La procedencia o el origen en una mancha de sangre humana es inconfundible con la de ningún otro animal excepto aquéllos que zoológicamente están relacionados con la especie humana como es el mono . . . . . la sangre del pañuelo, no había duda alguna ante el perito que in-

vestigó, que pudiera ser ésa sangre de un mono.... Ese examen se practicó también en la que aparece en el billete de cinco dólares marcado 'C11481006A' y utilizando los procedimientos que ya ha descrito el perito, llegué a la conclusión de que la mancha de ese billete era de sangre humana.

"La última fase de la investigación, que por cierto fué la más difícil, consistió en establecer la analogía entre la mancha de sangre que aparecía en el billete con las que aparecían en el pañuelo. Y como ése es un procedimiento que explicándolo a viva voz quizás la Corte no podría darse exacta cuenta del fundamento científico y del procedimiento, por eso solicité permiso de la Corte para explicarlo por escrito en una pizarra. De modo que se sienta en el siguiente principio biológico: (El perito ilustra por medio de un diagrama en la pizarra que se le facilitara.) Como todos los individuos de la raza humana tienen en los glóbulos de su sangre glutoninas del tipo 'A' o del tipo 'B', de cualquiera de esos dos tipos, se designan por dos letras, pero hay que señalarlos de alguna forma al explicar el método. El suero de toda sangre, de cualquier individuo de la raza humana, en el suero, en los glóbulos tiene glutonina del grupo 'a' minúscula y 'b' minúscula, 'A' mayúscula y 'B' mayúscula. Esta es la otra base que se sienta en este sistema de identificación de sangre de un individuo con la de otro.

"Segundo fundamento: En un mismo individuo no puede existir conjuntamente la glutonina 'A' mayúscula y la glutonina 'a' minúscula porque si la glutonina de la 'a' minúscula se confunde con la 'A' mayúscula entonces esa sangre formaría una masa compacta y entonces sobrevendría la muerte de un individuo por necesidad. Fundándonos en este principio, cuando un individuo por esas reacciones se sabe que tiene la glutonina 'A', se dice que pertenece al grupo 'A', cuando tiene la glutonina 'B' se dice que pertenece al grupo 'B' y cuando tiene las dos al grupo 'A' y 'B'; y cuando no tiene ninguna de las dos entonces pertenece al grupo CERO. Quiere decir, que en la raza humana no se puede encontrar un solo individuo que carezca de alguna de esas características en esa clasificación. Ahora vamos a ver en qué podemos utilizar eso en las investigaciones criminales .... pero antes de llegar a eso vamos a enunciar el tercer fundamento y es que esa característica es inmutable en el individuo a tal extremo que el que nace en el grupo 'A', ni el clima, ni los hábitos, ni la alimentación, ni nada le hace cambiar del grupo 'A' al grupo 'B' o del grupo 'A y B' al grupo 'C', y ese individuo dondequiera que va, va dejando rastro de su característica. El individuo del grupo 'A' que tiene las características 'A' si deja

un rastro de sangre en una tela o ante la superficie de un cuerpo sólido y después se desea saber si esa sangre pertenece a la característica de esa persona o de ese individuo, por medio de esas reacciones biológicas puede llegarse a la conclusión de que ha sido así. . . . En este caso que investigué y que estoy explicando ahora, la sangre del pañuelo apareció en el grupo 'A' y la sangre del billete apareció también en el grupo 'A'.''

Preguntado, ''Doctor, ¿a qué conclusión llegó después de usted averiguar que la sangre del pañuelo pertenecía al grupo 'A' y la sangre del billete pertenecía al grupo 'A' '', contestó, ''Que era de la misma naturaleza. —¿Que era de la misma sangre? Sí señor.''

Declaró entonces Tomás E. Molina que conocía al acusado Fernando Olivencia y le había prestado hacía meses un ''sweater'' color vino. Reconoce el que le presenta el fiscal como el ''sweater'' que prestara y Ovidio Ramos lo reconoce también como el que en la noche del treinta de noviembre de 1936, como a las nueve, entregó al dicho acusado en el cafetín de un hermano del testigo donde lo había dejado el acusado. Se introdujo en evidencia el ''sweater'' y fué admitido con la oposición de la defensa.

Sunta Collazo, concubina de Vientós dijo que la última vez que vió a éste fué en la repetida noche del treinta de noviembre, de ocho y cuarto a ocho y media. Vestía de gris y tenía mil doscientos dólares en el bolsillo derecho del pantalón y con ellos salió de la casa situada en la Salud donde vivía con la declarante y no regresó. Iba para el Casino situado en los altos de la ''Hardware'', frente a la Plaza de Colón.

Ricardo Nadal Cabassa vió a Vientós en la noche del treinta en el Casino de Mayagüez como a las once y media. El testigo salió para ''La Greca'' y allí volvió a verlo como de una a una y media, yéndose Vientós y quedando él en el café. También vió esa noche a los acusados en ''La Greca'' más o menos a las dos de la madrugada, en compañía de Felipe, primo de Krenly. Éste ''se acercó a la mesa en que

estaba yo sentado; Nano y Felipe me parece que siguieron hacia el segundo departamento de 'La Greca'. Sobre la mesa nosotros teníamos una botella de ron de la cual estábamos sirviéndonos. Krenly se sirvió un palo, él es amigo mío y tenía confianza. . . . Me parece a mí que estaba vestido de blanco o gris, algo así.''

Emilio Nochera vió en la noche de autos al acusado Krenly Olivencia en la esquina detrás del Casino de Mayagüez, sería como la una o la una y media, mirando ''para arriba y para abajo de la calle.''

Se llamó a Maximino Colón Rivera, otra de las personas que estuvo en el velorio del barrio de Juan Alonso. Al regresar a la ciudad, en la esquina de las calles San Ignacio y **Jagüita** vió parados dos jóvenes uno vestido de blanco y otro camisa cardenal y pantalón gris. Siguió caminando y se encontró con Vientós. Eso fué como a la una y pico.

Carlos Nazario fué el siguiente testigo llamado a declarar. En la noche del suceso como de doce y media a una menos cuarto vió a Krenly Olivencia frente a ''La Greca'' y a Fernando en ''la plaza cuando pasaba del Casino''. El primero vestía de blanco, el segundo pantalón gris y camisa color vino. Krenly ''me pidió el cigarrillo y yo le pregunté: '¿Qué haces por aquí?' y me dijo 'pues ahí', y en ese momento entré a La Greca y encontré al interfecto dentro de La Greca y lo saludé. . .'' Vientós se retiró como a los diez o quince minutos.

Volvió a ver a los acusados esa noche en ''La Greca'' como a las dos y media más o menos. Entraron. Refiere el acto de Krenly en la mesa de Nadal y luego dice: ''Pidieron una botella de ron 'Puerto Rico' y me ofrecieron darme y yo les dije que no y entonces pidieron unos pasteles y al comérselos estaban hablando cosa que yo no recuerdo y entonces él se levantó y pagó. . . . Con un billete de cinco pesos.''

Jorge Vélez declaró que la repetida noche del crimen salió del Club Mayagüezano más o menos a la una menos cuarto y pasó por la calle San Ignacio, esquina Jagüita y vió a

Krenly Olivencia vestido de blanco y a otro que no conoció vestido de gris con un "sweater" color vino, con un palo. La calle estaba sola. Había luna.

El último testigo que el fiscal llamó a declarar lo fué José Irizarry. Se refirió a cierta discusión que presenció en el Casino de Mayagüez entre Krenly Olivencia y Vientós terminada la cual el primero le dijo: "que tenía ganas de darle cuatro palos a Claudio."

Tal fué, en resumen, la evidencia aportada por el representante del Pueblo en este caso. De haberse admitido correctamente, creída como fué por el jurado, es a nuestro juicio suficiente. No hay un solo testigo que impute directamente la comisión del crimen a los acusados, pero los indicios se hallan tan bien y fuertemente eslabonados que los encierran en un círculo que sólo es compatible con su culpabilidad.

La prueba de la defensa tendió a demostrar que los acusados no se encontraban en el sitio del suceso en la fecha y hora en que ocurrió la muerte de Vientós y que el billete que el acusado Krenly Olivencia entregó al dependiente de "La Greca" en la madrugada del primero de diciembre de 1936 lo adquirió legalmente sin que pudiera determinarse que fuera el mismo que examinara el perito Dr. del Valle Sárraga, pero no fué creída por el jurado.

Éste al dirimir el conflicto que pudiera levantar dicha prueba, en favor de la de cargo, actuó en el ejercicio de sus facultades y no existe fundamento alguno que permita concluir que de ellas abusara.

■■ Examinemos ahora los once errores que señalan los apelantes como cometidos por la corte al admitir la evidencia.

Declaraba Carlos Ayala, el sexto testigo presentado por el fiscal. Preguntado por éste a quién se le parecía la tercera de las tres personas que vió en la esquina de las calles San Ignacio y Jagüita, contestó "Bueno, yo ligeramente, se me pareció . . ." La defensa pidió la eliminación de lo declarado. No accedió la corte y el testigo finalmente con-

testó: "Bueno, ese último que describí se me pareció a Krenly Olivencia." Y explicando la razón de su dicho dijo que por el traje que vestía y por la barbilla del lado derecho de la cara.

Aparte de que el error de haberse cometido no podría considerarse como perjudicial ya que anteriormente había declarado Matildo Colón Rivera que había reconocido a Krenly Olivencia, creemos que en verdad no fué cometido.

Bastará para sostener la conclusión que transcribamos la cita de Underhill que contiene el informe del fiscal. Dice:

"La identidad del acusado con la persona que cometió el delito es un elemento de importancia. El probarlo es siempre esencial y en algunos casos difícil. La pertinencia de la evidencia de identificación depende de las circunstancias del caso. En términos generales, cualquier hecho que convenza o tienda a convencer a una persona de criterio común en el desempeño de sus quehaceres diarios, de la identidad de una persona, será admitido en evidencia. Se permitirá a la evidencia tomar una gran latitud. Generalmente la prueba de identidad viene de aquéllos que estaban presentes cuando se cometió el delito y que dicen vieron al acusado cometerlo. Esto es prueba directa de identificación, pero prueba circunstancial es también admisible. En un caso extremo de esta clase en que apareció que el delito fué cometido en un jueves, se permitió al Pueblo probar que el acusado abrigaba una creencia supersticiosa de que el jueves era su día de suerte y que tendría siempre éxito en cualquier empresa que intentara ese día. Asimismo también puede probarse que el acusado había sido previamente procesado bajo el nombre supuesto alegado en la acusación. Un testigo puede declarar que él identificó al acusado después de su arresto como a la persona que él vió cometer el delito. Y un testigo puede declarar que una fotografía del acusado tomada al momento de su arresto y presentada al testigo en el momento de declarar, se parece a la persona que él vió cometer el delito. Un testigo que declara con respecto a la identidad de un acusado, puede describir a una persona que él vió en la vecindad del sitio donde se cometió el delito en la fecha de su comisión, así como también puede declarar con respecto al color, altura, peso y otros detalles personales de esa persona y su descripción puede ser comparada con la 'del acusado por el jurado.' . . .

"Es propio, a fin de que el jurado pueda determinar el conocimiento de un testigo que está declarando en relación con la identidad del acusado, que se permita preguntarle por cuánto tiempo ha conocido al acusado y por qué término y a qué intervalos lo ha visitado. Cuando la evidencia de la identidad es prueba circunstancial, se le concede una gran amplitud. Cualesquiera hechos que en su faz aparezcan relacionarse con el acusado y que sean de carácter descriptivo correspondiendo en sus detalles con la descripción del acusado, demostrada por otra prueba, deben ser admisibles. Así, una descripción del acusado dando su nombre, edad, nacionalidad, sitio de nacimiento y puerto de arribo contenida en un informe preparado por un oficial de un barco para los funcionarios a cargo de la inmigración, fué declarada admisible en un caso donde, de acuerdo con la prueba, aparecía que el acusado había sido un inmigrante, y la demás descripción se compaginaba en sus detalles con los otros hechos que surgían de la evidencia. La presencia del automóvil del acusado cerca de la escena del crimen al tiempo de su comisión, o sus huellas dactilares en la escena del delito, son admisibles.

"Si un testigo al identificar al acusado como la persona que cometió el crimen está expresando una opinión o relatando un hecho dentro de su propio conocimiento, es una cuestión sobre la cual existe diversidad de criterio. Algunas autoridades consideran la identidad como un hecho y requieren que el testigo identifique al acusado únicamente como cuestión de su propio conocimiento o de su recuerdo personal. Así, el testigo puede ser preguntado, '¿Ud. conoce a A?' y si lo conoce, entonces puede expresar si el acusado es la persona mencionada. No puede permitírsele decir que él 'cree' que el acusado es A, o dar su impresión de que un hombre que él vió cerca de la escena del crimen es idéntico al acusado. Debe expresar hechos dejando la inferencia de la identidad al jurado.

"De acuerdo con otro punto de vista, un testigo, al identificar al acusado, está expresando una opinión o impresión fundada en su observación de numerosos detalles, como su apariencia física, su traje u otros incidentes personales y peculiares. Se le permite, por tanto, frasear su contestación a cualquier pregunta relacionada con la identidad del acusado como si expresase su opinión o creencia, o frasearla como su impresión principalmente porque los hechos similares, o lo contrario, en apariencia personal son tan numerosos y peculiares, que no pueden narrarse específicamente para presentar así claramente al jurado el concepto de su verdadero peso y significado. Así, pues, un testigo después de describir a una persona que él ha

visto puede expresar que en su opinión era el acusado o que él se parecía al acusado, bajo la misma teoría que permite a un testigo, aunque no sea experto, dar su opinión en cualquier asunto donde el jurado no podría de otro modo formar un concepto inteligente de la identidad.

"La declaración de un testigo de que él creía haber reconocido al acusado como la persona que él vió llevarse la propiedad robada y que él vió y reconoció a otras personas que estaban con él, ha sido declarada admisible. . Por supuesto, aún si se acepta que la identidad es un hecho, la contestación del testigo no debería ser rechazada porque el testigo no esté absolutamente cierto de la identidad del acusado, fuera de toda duda razonable, ó porque, a causa de extremada precaución, cualificó sus contestaciones con expresiones tales como 'me parece', o 'yo creo'. No se puede esperar que los testigos relaten todos los hechos con igual certeza . . . Incertidumbre en la prueba de identificación va al peso de dicha prueba más bien que a su admisibilidad.

"Prueba de la identidad por un solo testigo, si es creída, es suficiente, toda vez que el· acusado no tiene· que ser identificado de una manera positiva por ningún número de testigos, pero la identificación debe ser razonablemente clara y convincente." Underhill on Criminal Evidence, cuarta edición, página 173, párrafo 127.

La cuestión que el señalamiento de error envuelve va más bien al peso que a la admisibilidad de la evidencia. Claro es que un testimonio que sólo indique el parecido de un ser humano a una determinada persona no será por sí solo suficiente para concluir que dicho ser era tal persona, pero eso no quiere decir que el testimonio no sea admisible ya que unido a otros podrían todos robustecerse entre sí hasta llegar a sostener la conclusión. Repetimos que en este caso ya otro testigo había declarado sin vacilación alguna que el ser humano que se le pareció al testigo al acusado Krenly Olivencia, era en verdad dicho acusado.

■ Los errores segundo, tercero, cuarto y quinto se refieren a la admisión en evidencia de los cuatro billetes de cinco dólares ocupados por el policía Vélez en "La Greca". Específicamente se imputa el segundo al admitir que Vélez identificara los billetes sin que se conectara a los acusados con

los mismos, el tercero al permitirse mostrar a Vélez los billetes sin la indicada previa conexión, el cuarto al admitirse en evidencia los billetes faltando la conexión y el quinto al permitirse el interrogatorio del perito Dr. del Valle Sárraga sobre su examen de billetes no conectados con los acusados.

A nuestro juicio no se cometieron los indicados errores. Se imputaba un delito de asesinato cometido voluntariamente con malicia premeditada y con el firme propósito de matar, al intentarse robo. Toda la prueba es indiciaria. Y los indicios que aporta conectan estrechamente uno de los cuatro billetes con los acusados. El elemento que se sostiene que falta, existe. Veámoslo.

Por el testimonio de Sunta Collazo, concubina de Vientós, sabemos que éste salió de su casa con mil doscientos dólares, por el de Vélez que se encontraron sobre su cadáver unos ciento sesenta y cuatro en uno de los bolsillos delanteros que quedaron bajo el cuerpo al caer sobre la calle asesinado, apareciendo los bolsillos traseros sacados hacia afuera. Sabemos también que los acusados estuvieron temprano en La Greca y al pagar una cuarta de ron Krenly abonó diez centavos quedando a deber cinco y que después de muerto Vientós volvieron a dicho establecimiento y Krenly para pagar lo que en él consumieron entregó un billete de cinco dólares. Y demuestra la prueba además que ese billete con el otro dinero producido por las ventas quedó guardado separadamente y fué de entre él que se ocuparon por la policía los cuatro billetes de cinco dólares encontrados uno de los cuales aparecía manchado, mancha que examinada por el perito resultó ser no sólo de sangre humana, si que de sangre humana igual a la que manchó el pañuelo de Vientós al ser herido. La conexión es completa.

Los errores sexto y séptimo guardan relación con la admisión del "sweater" en evidencia, el sexto basándose en que cuando el *"sweater"* fué admitido ningún testigo había declarado que alguno de los acusados lo usara en la noche del crimen y el séptimo en que la evidencia no conecta al

acusado Fernando Olivencia, a quien tendía a perjudicar la admisión, con el delito perseguido.

Es cierto que el "sweater" color vino se admitió antes de que declarara el testigo Jorge Vélez de modo concreto que el otro joven que estaba con Krenly Olivencia parado en la esquina de las calles San Ignacio y Jagüita vestía un "sweater" color vino, pero es lo cierto también que varios testigos habían descrito ya a uno de los jóvenes que vieron parados en la dicha esquina como vistiendo camisa color vino.

No erró, pues, la corte en la admisión de que se trata por el motivo señalado en el error sexto, ni tampoco por el que se señala en el séptimo, ya que si bien hay que reconocer que la prueba es mucho más fuerte en cuanto al acusado Krenly Olivencia, no deja de ser suficiente en cuanto a Fernando del mismo apellido, que había recibido el "sweater" en cuestión en préstamo de su dueño Tomás E. Molina, que lo había dejado en el cafetín del hermano de Ovidio Ramos y que fué por él en la noche del treinta de noviembre de 1936, como a las nueve.

■ Por el octavo señalamiento se sostiene que la corte erró al permitir que la testigo Sunta Collazo declarara que Vientós tenía mil doscientos dólares, porque ello constituyó una variación fatal de lo alegado en la acusación.

Argumentando el señalamiento se expresan en su alegato los abogados de los acusados, en parte, como sigue:

"Basó la defensa su oposición en que la acusación substancialmente imputa a los acusados en este caso la realización de la muerte *en ocasión de intentarse robo* (véase transcripción autos página 1), siendo por tanto la modalidad especial imputada a los acusados el ocasionar muerte mientras *intentaban cometer robo* y *no mientras realizaron el delito de robo*. Permitir que ahora, por la declaración de esta testigo de cargo, Sunta Collazo, se demostrara que el interfecto llevaba en su poder dinero y que éste le había sido sustraído, realizando así los acusados un delito de robo, y no una *tentativa de robo,* constituía necesariamente una variación fatal substancial entre las alegaciones específicas de la acusación y la prueba practicada, ya

que el delito de robo en grado de tentativa es completamente distinto al delito de robo.''

Conocemos la acusación. Imputa a los acusados la comisión de un delito de asesinato cometido al dar muerte a Vientós de una manera ilegal y voluntaria, con malicia premeditada y con el propósito firme y deliberado de matarlo, demostrando tener un corazón pervertido y maligno. Dice además ''en ocasión de intentarse robo'', pero si esas palabras se eliminaran la imputación sería suficiente y el fiscal hubiera podido, eso no obstante, presentar evidencia demostrativa de que el hecho ocurrió en ocasión de perpetrarse un robo.

Y·si ello es así y si dichas palabras, como sostiene el fiscal, se usaron para determinar el móvil del delito que aunque no constituye un elemento esencial que deba necesariamente alegarse y probarse, puede ser alegado y probado, ¿por qué no admitir como evidencia de la intención la realización del acto intentado?

Además nos parece que los casos del *Pueblo* v. *Izquierdo,* 25 D.P.R. 382 y *Pueblo* v. *Matos,* 26 D.P.R. 586, resuelven la cuestión en sentido contrario a la contención de los apelantes.

En el primero de ellos por la acusación se imputó a Rufino Izquierdo la muerte del niño Ramón Mercado cometida voluntariamente y con malicia premeditada y propósito firme y deliberado, demostrando tener un corazón pervertido y maligno y la evidencia tendió a probar que el asesinato se perpetró al cometerse un delito de escalamiento. Se sostuvo por el apelante que existía una variación fatal y esta corte resolvió la cuestión suscitada en la negativa. En la opinión se cita jurisprudencia de varios estados. Nos limitaremos a transcribir la de Texas. Quedó establecida en el caso de *Wilkins* v. *State,* 34 S. W. 627, como sigue:

''Se ataca la instrucción de la corte porque indicó al jurado que 'todo asesinato cometido con malicia expresa es asesinato en primer grado,' y 'que la ley declara que todo asesinato cometido en la per-

'petración o tentativa de perpetrar robo, es asesinato en primer grado.'

"La última manifestación se ataca porque la acusación en este caso solamente imputa el hecho del asesinato con malicia premeditada, y ninguna parte de ella imputa el asesinato al cometer o intentar cometer el delito de robo. La alegación del apelante en ambos casos ha sido decidida en contra suya. Véase *Sharpe* v. *State*, 17 Tex. App. 486; *Giles* v. *State*, 23 Tex. App. 281, 4 S. W. 886. No hubo error al definir el robo, porque está establecido que bajo una acusación de asesinato con malicia premeditada, el acusado puede ser convicto de asesinato en primer grado si se cometió en la perpetración o tentativa de perpetrar robo. Era deber de la corte definir lo que se entiende por robo."

Y en el caso de *Matos,* supra, copiando del resumen, se resolvió que:

"Alegándose en la acusación que la muerte fué causada por los acusados de manera ilegal y voluntaria, con malicia premeditada y propósito firme y deliberado, acechándolo y atacándolo alevosamente, aunque no contenga la afirmación de que la muerte ocurrió al perpetrarse un robo, tal acusación imputa un delito de asesinato en primer grado y podría probarse en el juicio que la muerte ocurrió al perpetrarse un robo."

■ El noveno señalamiento de error se formula así:

"La corte cometió error al manifestar como manifestó que entendía que no había contradicción fundamental entre lo declarado por la testigo Sunta Collazo al Fiscal y lo declarado en la silla testifical, no solamente porque la contradicción existía, si que también porque el determinar una cosa o la otra compete a los caballeros del Jurado y no al Juez que preside la Corte."

Mientras declaraba la testigo de cargo Sunta Collazo surgió un incidente en relación con una supuesta contradicción que la defensa creyó advertir entre su actual declaración y la que había prestado ante el fiscal en la investigación preliminar del caso. Discutida ampliamente la cuestión, la corte, al resolverla, dijo: "Aclarada la situación el jurado apreciará la prueba. Entiende la corte que no hay contradicción fundamental."

Y alegan los apelantes que al actuar la corte de tal modo "traspasando los linderos de su facultad y privando al jurado de un derecho", perjudicó "grave y grandemente los derechos de estos acusados."

Hemos examinado los autos y a nuestro juicio el que la testigo declarara ante el fiscal en la investigación, que había manifestado a Vientós, "No te vayas que vas a perder el dinero y me dijo, 'yo vuelvo horita como a las once' y no volvió" y que luego en el juicio declarara "Yo le dije a él que yo quería siempre que él me comprara mi casa, que el dinero ese era para la casa, y me contestó que él me compraría la casa, que no me apurara que él tenía el dinero", no constituye una verdadera contradicción. Ambas manifestaciones se inspiran en el mismo temor, a saber, el de que pudiera perderse el dinero, siendo la segunda más específica.

Claro es que si iba Vientós para el casino donde se jugaba y él jugaba en efecto como tiende a demostrar la prueba, se explica que la mujer con quien vivía y que aspiraba naturalmente a que le proporcionara un hogar suyo, seguro, temiera por la pérdida del dinero.

Hubiera sido mejor que el juez no hubiera expresado opinión alguna, limitándose a decir lo que de modo tan correcto dijo primero, a saber: "Aclarada la situación el jurado apreciará la prueba", pero sus otras manifestaciones—expresivas después de todo de la verdad—no pudieron perjudicar ni hay el más leve indicio que demuestre que perjudicaran a los acusados.

Por el décimo señalamiento se imputa error a la corte al permitir que el testigo Irizarri declarara sobre la enemistad de uno de los acusados con Vientós, por ser ello contrario a la teoría de la acusación.

El error no existe. El nuevo elemento que la declaración admitida tendió a introducir no estaba en oposición con la imputación de asesinato perpetrado maliciosamente con premeditación, deliberación y propósito firme de causar la muerte,

demostrando tener un corazón pervertido y maligno, ni con el propósito de robar. Podría sumarse perfectamente a esas otras dañadas intenciones la de vengarse con motivo de resentimientos anteriores.

La verdad es que la declaración de que se trata, analizada en sí misma, bien poca importancia tiene, habiendo podido prescindir de ella El Pueblo sin perjudicar su caso, pero presentada como fué, siendo admisible, la corte actuó correctamente al permitir que se prestara. Véase Wharton on Criminal Evidence, edición 11, volumen 1, párrafo 255, página 307.

■■■ Resta sólo considerar el undécimo de los errores señalados. Se formula como sigue:

"La corte cometió error al negarse a ordenar la eliminación de la declaración de Sunta Collazo en relación con el dinero que dijo tenía el interfecto la noche de los sucesos, porque terminada la prueba de El Pueblo, de la misma no se probó que los acusados ni ninguno de ellos tuviera conocimiento de que el interfecto portaba esa noche cantidad alguna de dinero sobre su persona."

Si el delito de asesinato cuya comisión se imputó por El Pueblo a los acusados lo hubiera sido únicamente como perpetrado al intentarse o al cometer el de robo, la cuestión que se levanta sería importante, pero no la es si se parte de la base de que el asesinato de que aquí se trata consiste fundamentalmente en la muerte de un ser humano causada violentamente por otros con malicia premeditada, deliberación y propósito firme de causarla, demostrando tener un corazón pervertido y maligno.

No debe perderse de vista tampoco que prescindiendo de la idea del robo, la declaración aportó un elemento que contribuyó al esclarecimiento del delito conectando a los acusados con el sitio del crimen, como indica el fiscal en su informe.

Además el veredicto del jurado no fué por asesinato en primer grado. Lo fué, después de recibir de la corte las debidas instrucciones, por asesinato en segundo grado, lo que parece implicar que los jueces de hecho descartaron la evidencia en relación con el robo. De suerte que de haberse

cometido por la corte algún error, no podría considerarse como perjudicial.

"Después de rendido el veredicto", como se resuelve en *Crapo* v. *United States,* 100 F. (2d) 996, 1000, "cualquier presunción o inferencia de ley debe tomarse en cuenta para sostener la acusación. El veredicto cura meros errores formales o técnicos, a menos que sea manifiesto que han perjudicado al acusado."

Procede, a virtud de todo lo expuesto, la confirmación de la sentencia apelada. Se trata de un crimen horrendo. A la inmediata, activa e inteligente actuación del Ministerio Público y de la Policía se debe sin duda alguna el descubrimiento de sus autores. Toda es prueba de indicios la aportada, pero clara, fuerte, convincente. El veredicto del jurado pidiendo clemencia pone de manifiesto que no obstante la influencia que ejerció seguramente en ellos la juventud de los acusados y su defensa hábil, los jueces que lo formaron obedecieron la voz de su conciencia dando salida al sentimiento únicamente en la forma expresada. La pena impuesta por el juez es fuerte, pero está autorizada por la ley y justificada por la forma en que se cometió el delito. Todo induce a creer que se hizo cumplida justicia. *En tal virtud el recurso interpuesto debe declararse sin lugar y confirmarse la resolución y la sentencia apeladas.*