DIONISIO RAMOS ORTIZ, peticionario y apelante, *v.* FÉLIX RIVERA, JEFE DEL PRESIDIO INSULAR, demandado y apelado.

Núm. 9597.—*Sometido:* Febrero 4, 1948. *Resuelto:* Abril 7, 1948.

*Santos P. Amadeo, Carlos Carrera Benítez, Nicolás Torres Marrero y Benjamín Rodríguez Ramón,* abogados del apelante; *Hon. Procurador General Interino C. Santana Becerra, y J. Rivera Barreras y Alberto Picó Santiago, Fiscal y Fiscal Auxiliar, respectivamente, del Tribunal Supremo,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Esta apelación se interpuso contra una resolución de 14 de agosto de 1947 dictada por el Juez Asociado de este Tribunal en funciones de turno, Hon. Borinquen Marrero Ríos. Otra petición de hábeas corpus basada, sustancialmente, en las mismas alegaciones, fué denegada siete años antes por el entonces Juez Presidente Hon. Emilio del Toro Cuevas, después de una audiencia en la cual las partes presentaron su prueba. La resolución del Juez Marrero está predicada, primordialmente, en que la resolución anterior denegatoria de la petición de hábeas corpus, constituye un impedi-

mento a la segunda por ser de aplicación la doctrina de *res judicata*. A ese efecto invocó la sección 8 de la Ley de 12 de marzo de 1903 Disponiendo el Auto de Hábeas Corpus, la cual, en lo pertinente, prescribe:

"Todas las providencias dictadas . . . contra las cuales no se hubiere apelado, serán definitivas y firmes, y no podrá presentarse nueva solicitud en la misma causa, salvo en los casos especialmente previstos por la ley." (Estatutos Revisados de 1911, pág. 1071).

Pero el apelante invoca el artículo 48 de la Ley Orgánica que en lo pertinente dispone:

"El Tribunal Supremo y las Cortes de Distrito de Puerto Rico y los respectivos Jueces de los mismos podrán conceder autos de *hábeas corpus* en todos los casos en que dichos autos puedan concederse por los Jueces de las Cortes de Distrito de los Estados Unidos. . ." .

Y arguye el apelante que como la doctrina de res judicata no es aplicable en las cortes federales en casos de hábeas corpus, la citada Ley de 1903, en tanto en cuanto prescribe que la doctrina de res judicata rige en casos de hábeas corpus, está en conflicto con el artículo 48 de la Ley Orgánica y consecuentemente es inconstitucional.

■■ Convenimos con el apelante en que en las cortes federales la doctrina de res judicata no es de estricta aplicación en casos de hábeas corpus. Así, un juez no está impedido de considerar una petición de hábeas corpus y resolverla en sus méritos por el mero hecho de que el mismo punto haya sido resuelto adversamente al peticionario en una petición anterior. *Ekberg* v. *United States,* 167 F. 2d 380 (C.C.A. 1st) resuelto el 25 de marzo de 1948. En el caso de *Salinger* v. *Loisel* 265 U. S. 224 (1924), en que principalmente descansa la proposición del apelante, se expone la regla en términos tan claros que su lenguaje ha sido seguido sin alteración en casos posteriores. Se dice en el referido caso:

"Bajo la Ley Común la doctrina de res judicata no era aplicable a una decisión recaída en un procedimiento de hábeas cor-

pus en la que se denegaba la petición. Las cortes estatales, por lo general, han aceptado esa regla cuando no ha sido modificada por estatuto. Las cortes federales inferiores generalmente también la han seguido. Y esta Corte la ha aceptado y sancionado, si bien no ha dictado decisión expresa sobre la materia. Los casos de *Carter* v. *McClaughry,* 183 U. S. 365, 378 y *Ex Parte Spencer,* 228 U. S. 652, 658, son notables ejemplos. Consideramos la regla como bien establecida en esta jurisdicción.

''Pero de esto no se infiere que la desestimación de una solicitud de hábeas corpus no tenga pertinencia o importancia cuando está bajo consideración una solicitud posterior. Antiguamente cuando la desestimación de la solicitud no era revisable por apelación, jueces y cortes acostumbraban ejercitar un criterio independiente en cada nueva solicitud, no obstante el número de éstas. Pero cuando el derecho a revisar fué concedido, cesó la razón para aquella práctica y fué considerablemente variada, como fué también relativamente restringido el campo de investigación en casos de hábeas corpus al concederse una amplia revisión en los casos criminales.

''El estatuto federal (sec. 761, Rev. Stats.) no establece una regla específica sobre la materia, pero ordena a la Corte que 'disponga del peticionario, con arreglo a la ley y a la justicia'. Un estudio de la jurisprudencia demuestra que esta frase ha sido interpretada en el sentido de que al resolver cada petición debe ejercitarse una sana discreción guiada y gobernada por una debida consideración de todo cuanto pueda ser pertinente para determinar sobre la procedencia de la excarcelación solicitada. Entre las cuestiones a ser consideradas y aun a darle efecto decisivo, están: (*a*) el derecho a una revisión apelativa en el caso criminal que motivó la encarcelación; y (*b*) una desestimación anterior de una solicitud similar. (Citas.) La decisión en el caso de *Ex Parte Cuddy,* [40 Fed. 62] recayó sobre una segunda solicitud y fué dictada por el Juez Field. Aunque resolvió que la doctrina de res judicata era inaplicable, dijo: 'Los funcionarios ante quienes se presenta la segunda solicitud pueden tomar en consideración el hecho de que una petición anterior ha sido presentada a otro funcionario y denegada; y en algunos casos ese hecho puede justificar la desestimación de la segunda. *La actuación de la corte o juez en la segunda solicitud naturalmente será afectada hasta cierto punto por el carácter de la corte o funcionario a quien se haya presentado la solicitud y la amplitud de la consideración que le haya dado.'*

"En la práctica las reglas aquí esbozadas darán al auto de hábeas corpus su reconocido status de un auto privilegiado de libertad y a la vez impedirán que se abuse del mismo. Como una garantía adicional contra el abuso, la corte, si de otro modo no ha sido informada, puede al recibir la solicitud, exigir al peticionario que demuestre si ha hecho una petición anterior, y de ser así, cuál fué la resolución recaída.

"En el presente caso la desestimación de la petición anterior lo fué por una corte de igual categoría y fué confirmada en una bien estudiada opinión de la Corte de Circuito de Apelaciones. Si la Corte de Distrito hubiera denegado la segunda petición por ese motivo, su discreción hubiese estado bien ejercitada y hubiéramos sostenido su decisión sin ulterior discusión. Pero su decisión no estuvo predicada en ese fundamento, y, como el récord revela circunstancias que justifican que consideremos y resolvamos dos objeciones contra el traslado del peticionario a la otra prisión, pasaremos a considerarlas." (Bastardillas nuestras.)

No hay duda pues, que las cortes federales tienen jurisdicción para conceder autos de hábeas corpus aun en aquellos casos en que una petición anterior haya sido previamente denegada, sujeto ello, desde luego, a las limitaciones expresadas en el caso de *Salinger*, supra. En otras palabras, que la doctrina de res judicata no se aplica inflexiblemente en las cortes federales en casos de hábeas corpus. Consciente de esta regla aplicada por las cortes federales desde su creación, el Congreso dispuso en el artículo 48 de la Ley Orgánica que el Tribunal Supremo de Puerto Rico y las Cortes de Distrito y sus respectivos Jueces, tengan jurisdicción para conceder autos de hábeas corpus "en todos los casos en que dicho remedio pueda concederse por los Jueces de las Cortes de Distrito de los Estados Unidos". Esa disposición de la Ley Orgánica claramente expresa la intención del Congreso de garantizar que en Puerto Rico el auto de hábeas corpus pueda expedirse, por lo menos, en los mismos casos en que lo expiden las Cortes de Distrito de los Estados Unidos. Siendo ello así, al prescribir la Ley de 12 de

marzo de 1903 que la doctrina de res judicata sea aplicable inflexiblemente a los casos de hábeas corpus tendió a privar de jurisdicción a los jueces insulares en casos en que la tienen las cortes federales y contrarió, por tanto, el artículo 48 de la Ley Orgánica. Consecuentemente esa disposición es inconstitucional.

Siguiendo la norma establecida en el caso de *Salinger*, supra, pasaremos ahora a determinar si el Juez Del Toro, al denegar la primera petición de hábeas corpus, "dispuso del peticionario con arreglo a la ley y a la justicia". Para ello es preciso hacer una reseña de la primera solicitud y de la evidencia que se presentó ante dicho Juez.

Alegó en aquella ocasión el peticionario que el 5 de agosto de 1936, entre siete y siete media de la mañana, dió muerte a Manuel Muñiz Martínez; que inmediatamente fué conducido a la oficina del fiscal de distrito, al cual hizo una confesión del acto criminal cometido por él y a base de ella dicho funcionario presentó contra él una acusación de asesinato en primer grado; que el mismo día fué conducido ante el Juez de la Corte de Distrito de Ponce, quien le nombró un abogado defensor y como diez minutos después se procedió a la lectura de la acusación, haciendo el acusado alegación de culpable y siendo sentenciado a reclusión perpetua entre diez y treinta y once de la mañana; que el nombramiento de abogado defensor fué pro forma porque debido al estado físico y mental del acusado y a la festinación con que se llevó a cabo el procedimiento, el apelante no pudo tener una defensa efectiva que estuviera a la altura de la gravedad del caso; que además el abogado defensor no pidió la suspensión del juicio y por el contrario permitió que festinadamente se sentenciara al acusado a reclusión perpetua; que dicho abogado consintió que se dictara sentencia inmediatamente en violación al artículo 309

del Código de Enjuiciamiento Criminal;(¹) que no solicitó del fiscal que se rebajara la calificación del delito, a pesar de que existían circunstancias atenuantes; que no presentó moción de nuevo juicio ni tampoco apeló de la sentencia; que el apelante se halla desde entonces recluído en la Penitenciaría Insular extinguiendo la sentencia y que su prisión es ilegal porque fué privado del debido procedimiento de ley por las circunstancias antes expresadas; que el procedimiento seguido contra el apelante violó el artículo 2 de la Ley Orgánica y las Enmiendas Quinta y Sexta de la Constitución de los Estados Unidos.

Tal fué, en síntesis, la primera petición de hábeas corpus. Al recibirla el Juez Del Toro señaló una audiencia a la cual asistieron el apelante, por sus abogados Santos P. Amadeo y otros, y el Jefe de la Penitenciaría, por el Fiscal Auxiliar de este Tribunal.

La prueba del apelante consistió del testimonio de Manuel Mariotta y del informe pericial del Dr. Néstor Vincenty. El primero declaró que en la fecha en que ocurrieron los hechos delictivos era reportero de El Imparcial en Ponce; que aquella mañana estuvo en el sitio de los sucesos y que se trasladó luego a la oficina del fiscal de distrito y allí vió por primera vez al acusado como a las nueve de la mañana; que el acusado declaró voluntariamente; que poco después fué llevado a la presencia del Juez Sepúlveda, quien celebró el juicio, sentenciándolo a reclusión perpetua; que desde el momento en que trajeron al acusado a presencia del juez hasta que fué sentenciado, transcurrieron

---

(¹) El artículo 309 del Código de Enjuiciamiento Criminal prescribe:

"Después de una confesión o veredicto de culpabilidad, o después de dado un veredicto contra el acusado, en un caso en que se alegare haber sido éste anteriormente declarado convicto o absuelto, si no se suspende la sentencia o se concede un nuevo juicio, el tribunal señalará día para dictar sentencia, que, en casos de *felony* (delito muy grave), será cuando menos dos días después del veredicto, si el tribunal se propone continuar en sesión, mientras tanto; pero si no fuese así, entonces será en fecha tan distante como pueda razonablemente fijarse."

de veinte a treinta minutos; que vió al Lic. Leopoldo Tormes en la sala de la corte; que dicho abogado conferenció con el acusado por espacio de cinco minutos en la entrada del estrado de la corte en un pasillo al lado del juez. Refiriéndose a la impresión que le causó el acusado en aquellos momentos dijo que estaba en un estado tranquilo, aunque mostraba estar un poco pálido y daba la impresión de esas personas que no se dan cuenta exacta del estado en que se encuentran; que el acusado declaró que había estado cinco días pensando si mataba o no al Sr. Muñiz; que la noche anterior la había pasado malísima y que se levantó bien temprano y se fué a la residencia del Sr. Muñiz y esperó que saliera y en el trayecto al establecimiento le hizo los disparos que le causaron la muerte; que el acusado, refiriéndose a los motivos que tuvo para matar a Muñiz dijo que había tenido un altercado con aquél, quien le había llamado pillo; que en distintas partes de Ponce trató de conseguir trabajo y que no lo obtuvo porque el Sr. Muñiz lo había desacreditado acusándolo de pillo; que en esos días su señora había tenido una niñita y su situación económica era muy mala. Más tarde, interrogado por el Juez Del Toro acerca del significado de su aseveración al efecto de que el acusado no parecía darse cuenta de lo que sucedía, contestó:

"En esos casos de asesinato en primer grado es una situación algo delicada para un acusado. No se debe dar uno exacta cuenta del delito que ha cometido, de la responsabilidad que tiene. El no aparentaba darse cuenta de la situación en que estaba, en que se había metido, la responsabilidad que podía tener al dar una confesión en esos momentos."

El informe pericial del Dr. Vincenty estuvo basado en el examen que hizo del peticionario durante las dos tardes anteriores al 10 de septiembre de 1940, fecha en que se celebró la audiencia en el caso de hábeas corpus. De ese examen concluyó el perito que cuatro años antes, el día en que el acusado dió muerte a Muñiz y se celebró el juicio, era una persona anormal.

Pasaremos ahora a la prueba del Jefe de la Penitenciaría.

Declaró, en primer término, el abogado Rafael V. Pérez Marchand, fiscal que acusó al peticionario el 5 de agosto de 1936. Declaró que basó la acusación en la declaración espontánea prestada por el acusado ante él, luego de haberle hecho todas las advertencias de ley, y la cual fué corroborada por los testigos simultáneamente examinados, cuyos nombres aparecen al dorso de la acusación; que aquel día Dionisio Ramos Ortiz se hallaba en estado de aparente normalidad mental; que funda esa conclusión en la manera de entrar en su oficina, el modo en que procedió a informar los hechos, la actitud que asumió durante más de dos horas que lo tuvo bajo su observación y la forma en que alternaba en las conversaciones que abundaron alrededor del hecho de sangre que él relataba; que su apariencia física entonces era la misma que presentaba en los momentos en que se estaba celebrando la vista de la petición de hábeas corpus; que el Lic. Tormes estuvo presente mientras declaraba el acusado; que en todo momento el acusado manifestó expresamente su deseo de ser juzgado inmediamente; que antes de salir de fiscalía para la sala de sesiones el acusado habló con el letrado Tormes, quien oyó y presenció cuanto había ocurrido dentro de la oficina del fiscal y que al ser llevado a la corte el secretario procedió a leerle nuevamente la acusación.

El otro testigo que declaró para sostener la legalidad de la prisión que sufre el acusado fué el abogado Leopoldo Tormes, quien lo representó en el acto del juicio. Declaró este abogado que fué designado por la corte para representar al acusado; que el día del crimen, como a las nueve de la mañana, estuvo en la fiscalía para hablar con el fiscal en relación con un expediente de jurisdicción voluntaria cuya vista estaba señalada para aquel día; que allí vió al acusado y oyó la declaración que prestó ante el fiscal así como

la de los testigos de cargo; que el testigo conocía al acusado desde algún tiempo antes de la comisión del delito y nada de extraño observó en su conducta ante el fiscal; que luego lo llevaron a la sala de sesiones y hallándose presente el testigo, el Juez Sepúlveda lo designó como abogado de oficio por haber manifestado el acusado que no tenía abogado; que a pesar de haber oído su declaración y la de los testigos de cargo en la fiscalía, el testigo tuvo una entrevista con él por espacio de diez minutos en la sala de los abogados; que le preguntó si tenía padres o hermanos para que consultase también con ellos, contestándole el acusado: "Yo quiero salir de esto. El único responsable soy yo"; que en aquellos momentos pasó por allí el Lic. Francisco Parra Capó e intervino también en la entrevista con el acusado; que a instancias de éste volvieron a sala, advirtiéndole antes que la pena mínima que podía imponérsele era la de reclusión perpetua y el acusado manifestó que era culpable; que si el testigo hubiera notado que el acusado estaba actuando de una manera anormal él hubiese promovido la cuestión ante la corte; que no le hizo una defensa porque no tenía base alguna para ella; que no pidió la suspensión del caso porque tampoco había motivos, puesto que el acusado había aceptado la responsabilidad y los testigos de cargo le hacían imputaciones terribles; que no pidió al fiscal que rebajara la calificación porque no lo creyó prudente, toda vez que había oído declarar al acusado que había acechado a su víctima desde las cinco de la mañana en la casa del occiso, que había caminado tres cuadras tras él y le disparó por la espalda sin darle oportunidad para defenderse.

Basado en esta prueba el Juez Del Toro dictó una resolución denegando la petición de hábeas corpus por los siguientes fundamentos: Que el acusado espontáneamente y libre de coacción o presión declaró ante el fiscal y que su declaración y la de los testigos de cargo sirvió de base a di-

cho funcionario para formular la acusación; que ésta le fué leída en corte abierta asistido del abogado que le nombró la corte y allí, después de oír el amplio informe del fiscal y habiéndole hecho el juez todas las advertencias de ley, se declaró culpable y repetidamente ratificó sus declaración, siendo dictada la sentencia después que el acusado renunció al término que fija la ley para dictarla; que del récord no surge que existieran atenuantes o que de haberse pospuesto el juicio para un mes después y ser defendido el acusado por el mejor de los abogados, hubiera podido obtener una absolución o una condena más leve. Contra esa resolución no se estableció recurso alguno.

■ La petición que ahora nos ocupa, presentada ante el Juez Marrero, es igual a la anterior, excepto que ahora se alega que el procedimiento seguido en el caso criminal contravino lo dispuesto en ''The Treason Act'', 1695 (William III c.3) y se sostiene que ese antiguo estatuto inglés se halla en vigor en Puerto Rico.

''The Treason Act'' siendo anterior a la Constitución de los Estados Unidos, probablemente inspiró la Enmienda Sexta que garantiza a todo acusado la asistencia de abogado y la cual a su vez inspiró el artículo 2 de nuestra Ley Orgánica. Pero esto no significa que la Enmienda Sexta o el artículo 2 de la Ley Orgánica deban interpretarse como si se hubieran vaciado en ellos todos los detalles de procedimiento prescritos por el antiguo estatuto.

■ La cuestión ahora a determinar es si, por el mero hecho de haber sido sentenciado el acusado cuatro horas después de la comisión del delito, en el caso de asesinato, fueron violadas las garantías constitucionales del debido procedimiento de ley y de asistencia de abogado garantizadas por el artículo 2 de nuestra Ley Orgánica. A fin de hallar la correcta solución al problema, debemos examinar las circunstancias del caso que nos ocupa. Conforme aparece de la solicitud de hábeas corpus, cuando se cometió el de-

lito el acusado era un hombre de veintitrés años; había cursado el octavo grado y era empleado de comercio en la ciudad de Ponce. Una vez realizada la muerte, él mismo fué al Cuartel de la Policía e informó su delito. De allí fué llevado a presencia del fiscal, sin que se alegue que hubo presión o coacción alguna por parte de la Policía o cualquier otro funcionario que pudiera afectar su conducta con respecto al procedimiento que iba a instituirse contra él. Su propio testigo Manuel Mariotta manifestó que el acusado, en presencia del fiscal, voluntariamente confesó su delito y expuso todos los detalles del caso. El fiscal previamente le hizo las advertencias de ley, pero él quiso declarar y dijo al fiscal que quería terminar inmediatamente su caso porque él sabía que era culpable y único responsable del delito cometido. Allí habló con el abogado Tormes, quien también oyó las declaraciones de los testigos de cargo, las cuales corroboraron la confesión del acusado y perfectamente establecieron un caso de asesinato en primer grado. El fiscal le leyó la declaración que acababa de prestar ante él y el acusado se ratificó en la misma. Fué llevado entonces a presencia del Juez Sepúlveda, quien nombró al Lic. Tormes abogado de oficio. Éste, no obstante conocer el caso por lo que había oído en la Fiscalía y por haber hablado con el acusado, se retiró con éste a la sala de los abogados y allí volvió a conferenciar con él y le sugirió que consultase con sus familiares. El acusado insistió en que él era el único responsable y quería de una vez salir del caso. Mientras conferenciaba con su abogado intervino en la entrevista el Lic. Francisco Parra Capó. Su abogado le advirtió que la pena única del delito de asesinato en primer grado era la de reclusión perpetua, y ello no obstante, insistió en hacer su declaración de culpabilidad a fin de terminar de una vez y renunció al término para dictar sentencia.

Si la confesión se hubiera realizado a virtud de coacción, engaño o por ignorancia, podría alegarse que no tuvo el de-

bido proceso de ley; que la sentencia fué dictada sin juris-
dicción, y en su consecuencia, tendríamos que resolver que
el Juez Del Toro no "dispuso del caso del peticionario con
arreglo a la ley y a la justicia". Pero los derechos que
alega el peticionario fueron vulnerados son perfectamente
renunciables y cuando la renuncia se hace inteligentemente,
es válida. *Adams* v. *U. S. ex rel McCann,* 317 U. S. 269
(1942) y *Patton* v. *United States,* 281 U. S. 276 (1930). Nada
hay en nuestros estatutos dispositivo de que entre la co-
misión de un delito y la declaración de culpabilidad deba
transcurrir un término fijo y que éste no pueda ser inteli-
gentemente renunciado. El término que para dictar senten-
cia señala el artículo 309 del Código de Enjuiciamiento Cri-
minal, es renunciable y como cuestión de hecho es renunciado
frecuentemente por los acusados en los Tribunales de Puerto
Rico.

Parece claro que el Juez Del Toro dispuso del primer
caso de hábeas corpus "con arreglo a la ley y a la justi-
cia".

La próxima cuestión a resolver es si el Juez Ma-
rrero erró al denegar la segunda petición. Parecen perti-
nentes las palabras del Juez Learned Hand en el caso de
*United States* v. *Thompson,* 144 F.2d 604:

"Si bien es verdad que una resolución desestimando una peti-
ción de hábeas corpus no impide al peticionario radicar otra soli-
citud por los mismos fundamentos, ello no significa que pueda una
y otra vez acudir a la corte con nuevas solicitudes. Aun de este
gran auto puede abusarse y cuando la cuestión ha sido una vez
decidida tras la debida consideración, debe ponerse un fin so pena de
que la corte sea convertida en juguete de un convicto obstinado."

Y en el caso de *Wong Doo* v. *United States,* 265 U. S. 239.
(1924) donde, como en el presente caso, se denegó de plano
una segunda petición de hábeas corpus aplicando la doc-
trina de res judicata por haber sido denegada una petición
anterior, se dijo:

"En *Salinger* v. *Loisel,* que acabamos de decidir, ante 224, resolvimos que en las cortes federales la doctrina de res judicata no es aplicable por el hecho de haberse denegado una petición de hábeas corpus; pero que en aquellas cortes donde el reo presenta una segunda petición, el peso que deba darse a la resolución anterior debe determinarse de acuerdo con una sana discreción judicial guiada y gobernada por la consideración de cualquier circunstancia que sea pertinente. Por consiguiente, debemos resolver que en este caso las cortes inferiores erraron al aplicar la inflexible doctrina de res judicata. Pero esto no significa que la sentencia deba ser revocada; pues claramente aparece que la situación fué una en la cual, de acuerdo con una sana discreción judicial, debió darse peso decisivo a la anterior resolución.

"Llegamos a la conclusión de que la sentencia es correcta aunque los fundamentos son erróneos.''

En el caso que nos ocupa el Juez Marrero llegó a una conclusión correcta al denegar la solicitud de hábeas corpus, si bien es verdad que erró al fundar su decisión en la doctrina de res judicata. Pero las apelaciones se interponen contra la sentencia, no contra sus fundamentos. *Siendo el resultado correcto, procede su confirmación.*

El Juez Asociado Sr. Marrero no intervino.