EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MIGUEL ÁNGEL PALÓU MÁRQUEZ, acusado y apelante.

Número 15320.

*Sometido:* 22 de junio de 1953. *Resuelto:* 27 de mayo de 1958.

*César Andréu Ribas* y *Santos P. Amadeo,* abogados del apelante; *Hon. Secretario de Justicia J. B. Fernández Badillo* (*José Trías Monge, ex Secretario de Justicia,* en el alegato) y *Rafael L. Ydrach Yordán, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Miguel Ángel Palóu fue convicto en la Sala de San Juan del Tribunal Superior de ocho delitos de asesinato en primer grado y de dos delitos de atentado a la vida como consecuencia de un incendio malicioso perpetrado en el edificio número 300 de la Calle Fortaleza de San Juan en la madrugada del

15 de diciembre de 1949. El juicio se celebró ante un tribunal de derecho. Se le sentenció a pena de reclusión perpetua en cada uno de los ocho delitos de asesinato y a pena indeterminada de uno a diez años de presidio con trabajos forzados en cada caso de atentado a la vida. Procederemos a considerar y resolver la apelación que interpuso ante este Tribunal contra dichas sentencias.

Seis errores ha levantado el convicto-apelante. En el primero de ellos sostiene que el Tribunal Superior cometió error manifiesto al dictar las sentencias condenatorias a base de acusaciones que no contienen elementos suficientes en derecho para constituir los delitos imputados. Las acusaciones de asesinato en primer grado en lo pertinente exponen:

" . . . . . Los referidos acusados, Lucas E. Castro Anguita, Miguel Ángel Palóu Márquez y Miguel Cirilo Batalla y Suere, allá en horas comprendidas en la noche del 14 al 15 de diciembre de 1949 y en la ciudad de San Juan, Puerto Rico, . . . en forma ilegal, voluntaria y criminalmente, con malicia premeditada, deliberación, con intención y propósito decidido y firme de matar, demostrando tener corazones pervertidos y malignos, actuando los tres acusados de común acuerdo entre sí, dieron muerte ilegal al ser humano [nombre], al perpetrar dichos acusados un Incendio Malicioso en Primer Grado, en el edificio habitado, de tres pisos, número 300 para entonces, antes número 51, de la Calle Allen de San Juan, Puerto Rico, propiedad de Benigno Luiña y Pérez Villamil, ocupado allí y entonces por seres humanos en dos de sus pisos y en el otro por los almacenes Palóu de la firma comercial Miguel A. Palóu y Cía., S. en C., habiéndose preconcebido y planeado dicho incendio por los tres acusados entre sí. . . . ."

Arguye el apelante que según surge de las acusaciones a él se le imputó la comisión de delitos de asesinato en primer grado y de atentados a la vida como consecuencia de pegar fuego a un edificio; que la base estatutaria para clasificar las muertes como asesinato en primer grado lo fué en este caso el delito de incendio de morada, siendo superfluas por lo tanto, e innecesarias, las alegaciones sobre intención de matar, premeditación y deliberación; que el término

*incendio malicioso en primer grado* utilizado en las acusaciones no cubre el *incendio de morada* mencionado en el art. 201 del Código Penal porque éste contempla el delito tradicional de la ley común inglesa de incendio de la vivienda, y no el estatutario de incendio malicioso; y finalmente, que las acusaciones son también insuficientes en derecho por no alegarse en las mismas la intención de destruir el edificio.

El incendio de morada a que hace referencia el texto español del art. 201 del Código Penal, ([1]) 33 L.P.R.A. sec. 633, y el incendio malicioso en primer grado que se alega en las acusaciones, constituyen el delito establecido y definido en los arts. 398 y siguientes de dicho Código. No se trata de actos delictivos distintos. Según el art. 398, ([2]) 33 L.P.R.A. sec. 1561, es incendio malicioso el acto voluntario de pegar fuego a un edificio ajeno con intención de destruirlo. Los arts. 399 y 400 que le siguen, 33 L.P.R.A. secs. 1562, 1563, definen *edificio* como cualquier casa, estructura, barco u otra construcción capaz para dar abrigo a seres humanos o perteneciente o conexo a una estructura así adaptada; y *edificio habitado* como cualquiera estructura ocupada de noche por algún inquilino o morador. El art. 405, 33 L.P.R.A. sec. 1568, dispone que será incendio malicioso en primer grado el acto de incendiar maliciosamente, de noche, un *edificio habitado* en que estuviere alguna persona al tiempo de cometerse.

En la versión inglesa de estos artículos y del art. 201 a la cual, por razón de origen y procedencia, no es necesario repetir que debemos atenernos, se usa en común el vocablo "arson" tanto al referirse al incendio de morada de la traducción al castellano del art. 201, como al establecer y definir el delito de incendio malicioso en los arts. 398 y siguien-

---

([1]) Artículo 201.—Todo asesinato perpetrado por medio de veneno, acecho, o tortura, y toda clase de muerte alevosa, deliberada y premeditada, o cometida al perpetrarse o intentarse algún incendio de morada, rapto, robo, asalto, o mutilación, constituye asesinato de primer grado; siendo de segundo grado todos los demás.

([2]) Artículo 398.—Constituye incendio malicioso el acto voluntario de pegar fuego a un edificio ajeno con intención de destruirlo.

tes. Todos dichos artículos se adoptaron conjuntamente por nuestra Asamblea Legislativa al aprobarse el Código Penal de 1º de marzo de 1902 con igual procedencia; el 201 equivalente al 189 del Código Penal de California de 1872 según éste fué revisado en 1901, y los otros equivalentes a los arts. 447 y siguientes del referido Código tal como regían cuando los adoptamos y continuaron allá en vigor hasta el año 1929 en que fueron derogados, aprobándose entonces en California distinta legislación referente al incendio malicioso.(³) Aparte del hecho de que el delito de incendio malicioso estatuído en el art. 398 cubre el incendio de una morada, entendiéndose por morada la habitación o vivienda de una persona, ya que incluye el acto de pegar fuego a un edificio habitado, o sea un edificio ocupado de noche por algún inquilino o morador, nada indica que al aprobarse el Código Penal de 1902 hubo la intención de cambiar en el art. 201 el concepto estatutario del incendio malicioso (*arson*) del Código Penal de California, por el tradicional y más restringido concepto de este delito en la ley común, que en 1902 ya no prevalecía en dicho estado.(⁴) Alegando las acusaciones que se perpetró un incendio malicioso en un edificio habitado entonces por seres humanos, se imputó el delito de incendio de morada a los efectos del art. 201.

Son suficientes en derecho las acusaciones de asesinato y de atentado a la vida aunque en ellas no se exprese que

---

(³) 48 West's *Anno. Cal. Codes*, secs. 447(*a*), 448(*a*), 449(*a*). Un historial del delito estatutario de incendio malicioso en California (*arson*), y los efectos de la referida legislación de 1929, aparece en *Ex parte Bramble*, 187 P.2d 411, 31 Cal. 2d 43, cert. den. 337 U.S. 960.

(⁴) Según lo definieron Coke y Blackstone, constituía el delito de incendio malicioso (*arson*) en la ley común inglesa el quemar voluntaria y maliciosamente la vivienda (*dwelling house*) de otra persona, y no era requisito el que se pegara fuego con la intención de destruirla. El delito se consideró siempre como uno contra la seguridad de la habitación y de la persona, y no contra la propiedad. Por estatutos aprobados en 1850, 1856 y luego en su primer Código Penal de 1872, California se apartó del concepto clásico del delito en la ley común, ampliando estatutariamente su alcance para incluir casos en que no existía peligro a la vida humana, e imponiendo como requisito la intención de destruir la propiedad. En 1929 puede decirse que retornó un tanto a la ley

se pegó fuego al edificio con *intención de destruirlo*. Así lo dijimos en *Pueblo* v. *Castro*, 75 D.P.R. 672 (1953). El art. 201 caracteriza el asesinato en primer grado como la muerte efectuada por los medios del veneno, el acecho o la tortura expresados en el propio estatuto y cualquiera otra muerte, no especificada, igualmente voluntaria, deliberada y premeditada; o aquella cometida al perpetrarse o intentarse cualquiera de los delitos graves mencionados en dicho artículo 201, entre ellos, el incendio malicioso. Las acusaciones alegan malicia premeditada, deliberación e intención y propósito decidido y firme de matar, lo cual distingue el asesinato en primer grado. *Pueblo* v. *Méndez*, 74 D.P.R. 913 (1953), *Pueblo* v. *Blanco*, 77 D.P.R. 767 (1954). Pero aun cuando tales alegaciones se hubieren omitido, la alegación de haberse dado muerte al perpetrarse un incendio malicioso es suficiente para imputar el asesinato sin que fuera necesario expresar por separado los componentes del delito de incendio, por cuanto ellos están implícitamente alegados al seguirse el lenguaje del propio estatuto. *Pueblo* v. *Matos y Matos*, 26 D.P.R. 586 (1918); Cf: *Pueblo* v. *Acosta*, 11 D.P.R. 249 (1906); *Pueblo* v. *Aléstico*, 18 D.P.R. 320 (1912); *Pueblo* v. *Rosado*, 17 D.P.R. 441 (1911); *Pueblo* v. *Calero*, 18 D.P.R. 44 (1912); *Pueblo* v. *Izquierdo*, 25 D.P.R. 382 (1917); *Pueblo* v. *Olivencia*, 54 D.P.R. 908 (1939).

En el caso de *Acosta* resolvimos que en una acusación de asesinato en primer grado imputando que la muerte ocurrió en la perpetración de un escalamiento, uno de los delitos

común al derogar los arts. 447 y siguientes del Código Penal de 1872 referentes al incendio malicioso, adoptando en su lugar los arts. 447(a) y siguientes que hoy rigen. El art. 447(a), único en donde se usa el término "arson", se refiere exclusivamente a la habitación o vivienda de una persona y sus dependencias, como resultaba ser en la ley común, con la diferencia de que puede ser la vivienda propia o la de otro. No obstante ello, California ha resuelto que constituye incendio malicioso (*arson*) el pegar fuego a otras estructuras, que no sea la vivienda, descritas en el art. 448(a). *Ex parte Bramble*, supra. Véase: Bolton, *Arson in California*, 22 So. Cal. L. Rev. pág. 221. Nosotros, por el contrario, mantenemos todavía intacto el articulado que adoptamos en 1902.

enumerados en el artículo 201, no era necesario alegar que fué voluntaria, deliberada y alevosa. También resolvimos en el de *Alméstico* que habiéndose perpetrado el asesinato mediante acecho, un medio que el estatuto menciona para que se considere de primer grado, no era necesario otras pruebas de deliberación y premeditación. A la inversa, en *Izquierdo* dijimos que bajo una acusación de asesinato en primer grado en que se imputó haberse dado muerte ilegal voluntariamente, con malicia y propósito firme y deliberado de causarla, podía probarse que la muerte se cometió al perpetrarse un delito de escalamiento aunque este hecho no se alegara, sin que ello creara una variación tal entre la acusación y la prueba que dejara indefenso al acusado; y en el caso de *Matos*, supra, donde se probó que la muerte ocurrió al perpetrarse un robo, sostuvimos que era suficiente la acusación que imputaba la muerte ilegal voluntaria con malicia premeditada y propósito firme y deliberado, sin que fuera necesario alegar la perpetración del robo, aunque luego éste podía probarse. Similar al planteamiento que aquí nos hace el apelante, en ese caso se impugnó la suficiencia de la acusación porque no se alegaban los elementos componentes del delito de robo como base para la imputación de asesinato, siguiéndose meramente el lenguaje del estatuto. Resolvimos que ello no era necesario. Por otra parte, en una acusación de asesinato en primer grado basada en la perpetración de otro delito grave pueden concurrir, y no quedan necesariamente excluídos, los elementos mentales de la voluntariedad, premeditación y deliberación, dependiendo de los hechos que se prueben. No son por lo tanto ni defectuosas ni insuficientes en derecho las acusaciones en este caso y no violan el derecho constitucional del apelante, según alega, de ser notificado de la naturaleza y causa de la acusación. Carta Orgánica de 1917, art. 2, 39 Stat. 951, según enmendada; Tomo 1 L.P.R.A. págs. 54, 55. Véanse: *People* v. *Witt*, 170 Cal. 104, 148 Pac. 928; *Commonwealth* v. *Bruno*, 316 Pa. 394, 175 Atl. 518; *State* v. *Bunk*, 4 N.J. 461, 73 A.2d

249, cert. den. 340 U.S. 839; *Commonwealth* v. *Lowry*, 374 Pa. 594, 98 A.2d 733, cert. den. 347 U.S. 914; *People* v. *Coefield* (Cal.), 236 P.2d 570; *State* v. *Reading* (Idaho), 13 P.2d 253; *State* v. *King*, 24 (Utah) 482, 68 Pac. 418; *Harris* v. *State* (Wyo.), 242 Pac. 411; *State* v. *Meadows* (Mo.) 51 S.W.2d 1033; *Cochrane* v. *State* (Ariz.), 59 P.2d 658; *State* v. *Montgomery* (Wash.), 132 P.2d 720.

██ En el segundo error el apelante ataca la suficiencia de la prueba que sirvió de base para las sentencias condenatorias e imputa al tribunal sentenciador que actuó movido por parcialidad, pasión y prejuicio en la apreciación de la evidencia. Arguye en el tercero que la prueba, de ser cierta, demostró la comisión del delito de destruir e incendiar bienes asegurados para defraudar al asegurador, definido y castigado en el art. 478 del Código Penal, 33 L.P.R.A. sec. 1901, en cuyo caso, sostiene, las muertes serían punibles como asesinato en segundo grado al no mencionarse este delito específicamente en el art. 201.

Al comenzar el proceso, y terminado el Fiscal de exponer su teoría, las partes estipularon aceptar lo siguiente:

"que hubo un fuego el día 15 de diciembre de 1949 que se inició en los Almacenes Palóu, en los bajos del edificio número 300 de la Calle Allen; que entre ese sitio que ocupaban los Almacenes Palóu y el segundo y tercer pisos de ese edificio no había comunicación directa, pero había una escalera desde abajo que daba hacia los otros dos pisos, cuya escalera no tenía comunicación con los Almacenes Palóu y que del segundo y tercer pisos murieron ocho personas que se han nombrado por el Fiscal y dos salieron lesionadas según dice el Fiscal; que son las personas mencionadas en cada una de las acusaciones de asesinato y atentado a la vida. Que esas personas murieron por motivo de extensísimas y profundas quemaduras a consecuencia del fuego."(5)

---

(5) Las personas fallecidas que nombró el Fiscal fueron Antonio Rosa Requena de 83 años de edad, Francisco Rosa Sánchez, de 54 años, la niña Berty Santiago, menor de 8 años, residentes los tres en la tercera planta del edificio, los esposos Rosa Julia Maurent y Jorge Sandín López de 20 y 28 años de edad respectivamente, Adela Margarita Maurent Almo-

En el año 1944 el apelante y Lucas E. Castro constituyeron la sociedad mercantil en comandita Miguel A. Palóu y Cía., S. en C., con un capital de $12,000 aportado por igual, para dedicarse a la compraventa de tejidos, telas y otros artículos relacionados. Palóu era el socio gestor y Castro el socio comanditario. El 15 de diciembre de 1949 el negocio operaba en la planta baja del edificio número 300 de la Calle Fortaleza, casa contigua a la que hace esquina con la Calle Tanca, bajo el nombre de Almacenes Palóu. En 9 de septiembre de 1949 se renovó una póliza de seguro contra incendio sobre la mercancía por la cantidad de $40,000. En 3 de octubre de 1949 se hizo un endoso por escrito a dicha póliza, a requerimiento de Castro y con la anuencia de Palóu, para que cualquier pérdida que se determinare corresponder al asegurado bajo la misma fuera pagadera a Castro según su interés, con preferencia a otras personas.

Durante varios días estuvo Miguel Cirilo Batalla, coautor del fuego, declarando en corte sobre todos los hechos y demás pormenores relacionados con el incendio de los Almacenes Palóu. Su testimonio revela en síntesis lo siguiente:

Batalla, de nacionalidad cubana, llegó a Puerto Rico el 3 de noviembre de 1949 procedente de la ciudad de Nueva York donde residía y trabajaba, a requerimientos de Palóu, inclusive una llamada por teléfono internacional durante el mes anterior de octubre, para dedicarse ambos a un negocio con un capital de diez a doce mil dólares a ser aportado por Palóu. Desde su llegada y hasta el día en que ocurrieron los hechos, Batalla vivió con éste en su residencia, sita en el quinto piso de los Apartamientos San Cristóbal de San Juan. Pronto, Palóu le informó que el negocio que tenía en mente ya no podría hacerse y trataron de conseguir otros. Días después, no apareciendo ninguno, Batalla empezó a insistir en su deseo de regresar a Nueva York, y Palóu entonces le abordó el tema sobre la necesidad que él tenía de pegar fuego al negocio para cobrar la póliza de seguro, expresándole que no se vendía mucho y que la con-

dóvar, una joven de 20 años de edad, Josefa Almodóvar Vda. de Maurent, señora de 60 años y Noemí Franceschi Rivera, otra joven de 21 años, residentes éstos en la segunda planta.

dición económica del mismo era difícil; que tenía que tomar una medida violenta pegándole fuego y así pagar a sus acreedores y mantener el crédito, y que su mayor acreedor y la persona a quien más interés tenía en pagar era a Lucas Castro quien cobraría preferentemente a cualquier otro acreedor, con la promesa de éste de no retirarle su crédito y hasta de ampliárselo. Palóu y Batalla realizaron varias visitas a la residencia de Castro y en ellas discutieron más de una vez el asunto del incendio y la manera de llevarlo a cabo.

Decididos a quemar el establecimiento, aproximadamente quince días antes de la perpetración del incendio Palóu y Batalla adquirieron tres cubetas de lata con capacidad de cinco galones cada una, y en un sitio de Isla Verde las llenaron de gasolina tomándola del tanque de la guagua del negocio y las trajeron selladas al local dejándolas allí ocultas. Intentaron dar fuego en dos ocasiones con anterioridad a la madrugada del 15 de diciembre de 1949. En la primera de ellas desistieron porque mientras Batalla y Palóu estaban en un café cercano tomándose un licor, sonaron tiros en la esquina de las Calles Fortaleza y Tanca y se congregó en las inmediaciones del negocio un número de agentes del orden. La segunda ocasión fué en la noche del 13 de diciembre de 1949, entre ocho y diez. En ésta, Palóu y Batalla ya habían penetrado en el establecimiento y estaban haciendo los preparativos con la gasolina, pero debido a la mucha gente que pasaba viendo las vitrinas creyeron prudente no seguir adelante. Decidieron hacerlo finalmente al otro día, en la madrugada del 14 al 15. Temprano en la tarde del 14, Batalla fué a Inmigración en el Edificio de Correos de San Juan a llevar unos retratos para obtener el permiso que lo autorizara entrar nuevamente a Estados Unidos, siendo su intención partir para Cuba con posterioridad al incendio. Ahí se le unió Palóu quien le ayudó a entenderse con el personal de Inmigración en esas gestiones y al informársele que las fotografías no llenaban los requisitos fueron los dos en la guagua del negocio guiada por el chófer a una fotografía cerca de la plaza principal para obtener otros retratos. De allí partieron en la misma guagua hasta el Garage López Batalla sito en Martín Peña, donde despacharon al chófer. Fueron solos entonces a otro garage a gestionar un automóvil prestado, y autorizaron a Palóu para que recogiera el vehículo en la Parada 25 en un solar o área de estacionamiento perteneciente a dicho garage. Siendo más o menos

las 4:30 de la tarde, Palóu y Batalla se dirigieron en la guagua a la residencia de Lucas Castro a manifestarle la determinación de pegar fuego esa noche. Decidieron que debía ser entre tres y cuatro de la madrugada y discutieron otros detalles y pormenores, entre ellos, la falta de luz para lo cual Castro le entregó a Palóu una linterna eléctrica. Se habló del asunto de la gente de las plantas altas y de la posibilidad de que surgiera cualquier complicación, pero consideraron que la construcción del edificio y sus paredes y la madera dura que no quemaría no daría lugar a complicación alguna. Como a las seis de la tarde se despidieron de Lucas Castro deseándoles éste "buena suerte" dicho en inglés, obtuvieron el vehículo prestado en la Parada 25, marca Oldsmobile de dos puertas y dos colores, año 1942, con licencia número 3376, y regresaron directamente a San Juan a la residencia de Palóu, guiando éste la guagua y Batalla el automóvil prestado. Este mismo vehículo lo había tomado prestado Palóu el día anterior para ser usado en la intentona de pegar fuego en la noche del 13 de diciembre. Cerca de las dos de la mañana se levantaron, bajaron por la escalera del edificio sin usar el ascensor y utilizando el Oldsmobile dieron una vuelta por San Juan para observar la vigilancia a lo largo de la Calle Fortaleza. Vieron policías en las esquinas de la Plaza de Colón y siguieron hacia afuera hasta un cafetín más allá del Capitolio que estaba abierto, regresando a San Juan por el sector de los muelles. Subieron por la Calle Tanca y antes de llegar a la intersección de Fortaleza detuvieron el vehículo. Fueron a pie desde ese sitio hasta el negocio, a la vuelta de la esquina. Palóu abrió el establecimiento con su llave y ambos entraron. Una vez dentro se dirigieron al sitio donde estaban las cubetas de gasolina, las abrieron con un destornillador con la ayuda de la linterna eléctrica a la cual le pusieron una tela por encima para que no se viera de afuera, y regaron de 10 a 11 galones de gasolina por todas partes dentro del local, por las paredes, las estanterías y en todos los demás sitios donde había mercancía en lo cual se tomaron como media hora, utilizando para ello unos recipientes de cartón. Hecho esto caminaron hasta la puerta de entrada del edificio con las cubetas vacías y la gasolina restante, y Batalla se situó pegado a la puerta por su parte interior esperando que Palóu trajera de nuevo el vehículo que habían dejado en Tanca para meter en él las cubetas. Se presentó Palóu moviéndose despacio, Batalla metió rápidamente

las cubetas dentro del automóvil que ya tenía la puerta abierta y Palóu siguió lentamente retirándose unos metros. Batalla, situado ahora por la parte exterior de la puerta entreabierta, con el candado abierto en la mano encendió un fósforo y lo tiró hacia adentro del edificio, produciéndose allí mismo una tremenda explosión seguida de un incendio, que hizo volar las puertas y algunas piezas de tela hasta la acera opuesta de la calle y con ellas rodó Batalla por el piso recibiendo lesiones y quemaduras, aunque no perdió el conocimiento. Corrió a abordar el vehículo donde estaba Palóu y salieron por la Calle Fortaleza hacia Santurce. En un punto en el camino botaron el resto de la gasolina y en otro sitio, que se describió como una playa más o menos en el sector del Condado, lanzaron las cubetas. De allí siguieron hasta el solar en la Parada 25 a hacer entrega del automóvil. Batalla se bajó un poco antes para que no le vieran quemado y herido, comenzando en ese momento un viaje de fuga a través de varios pueblos de la isla que terminó como a las once de la mañana del 18 de diciembre de 1949 en que fué localizado y arrestado cerca de Sabana Grande. Al ser arrestado vestía ropas distintas que adquirió por el camino, presentaba quemaduras y lesiones en la cara, manos y en una pierna, tenía una barba crecida de varios días y portaba un saco con otros artículos de vestir y medicinas. Se le ocupó el destornillador que usaron para abrir las cubetas. En su declaración dada en corte Batalla expresó que debido a la falta de comunicación directa entre la planta baja donde estaba el negocio y la escalera y las plantas superiores, así como a la construcción del edificio y sus paredes de mampostería, ellos creyeron que las personas que allí residían no correrían peligro. Dijo también que él se hizo cargo de pegar el fuego porque a los fines del incendio, que era cobrar la póliza de seguro, Palóu no debía tener quemaduras ni olor en su ropa o señal otra alguna que pudiera identificarlo con un fuego intencional.

Los autos contienen abundante prueba, pericial inclusive, que corrobora el testimonio de este cómplice. El perito químico del Fiscal, si bien no aseguró que el combustible usado fué gasolina, manifestó que debió haberse utilizado un combustible volátil que esparcido dentro de aquel local cerrado formó con el aire durante el proceso de volatilización una mezcla explosiva capaz, al prenderse, de socavar los techos

y de destruir el edificio, seguida la explosión por un fuego intensivo. Concluyó que la substancia volátil que se usó allí pudo haber sido gasolina la cual, según dijo, produce una densa humareda especialmente si viene en contacto con géneros. Una de las dos personas que se salvaron declaró haber sentido un fuerte olor a gasolina, y la otra manifestó que la tercera planta se llenó de humo muy denso y asfixiante. Se corroboró el hecho de que el negocio de Palóu no estaba en buenas condiciones económicas, que hacía dos o tres años venía operando con pérdida, siendo su pasivo a la fecha del fuego en exceso de su activo, y que el acreedor principal del negocio lo era el socio Lucas Castro en la cantidad de $19,413.77. Hubo prueba, independientemente de la del cómplice, que confirmó las andanzas de Batalla y Palóu en la tarde del 14 de diciembre, y la gestión de Palóu esa tarde y el día anterior para obtener prestado el automóvil Oldsmobile que Batalla identificó como el que utilizaron esa madrugada, y en la intentona de la noche anterior. Un oficial de policía encontró abierto el candado de la entrada del local en la acera opuesta del edificio, cerca de las puertas y otros objetos que saltaron con la explosión. Ese candado se identificó además por la cajera del negocio que fué la persona que lo cerró la tarde anterior.

No hay evidencia en cuanto a la intervención de Palóu en el plan o designio en si, ni sobre su participación en el acto mismo de pegar fuego, fuera de la declaración ofrecida por Batalla. Pero hubo prueba, independiente, directa y circunstancial, encaminada a relacionarlo con la comisión del delito, tal como lo requiere el art. 253 del Código de Enjuiciamiento Criminal, (⁶) 34 L.P.R.A. sec. 732. Un testigo llamado Enrique Ventura Ortiz declaró que mientras

---

(⁶) Artículo 253.—No procede la convicción por declaración de un cómplice, a no ser que ésta sea confirmada por alguna otra prueba que, por sí misma y sin la ayuda del testimonio del cómplice, tienda a demostrar la relación del acusado con la comisión del delito; no siendo suficiente dicha corroboración si sólo prueba la perpetración del delito o las circunstancias del mismo.

subía esa madrugada por la Calle Tanca acompañado de Francisco Díaz Rivera vió a Palóu segundos antes de la explosión guiando solo un automóvil que describió como un carro claro de dos puertas; que Palóu les pasó despacio por el frente en la esquina de Fortaleza y Tanca con dirección al teatro, y el testigo observó que el vehículo se detuvo frente al establecimiento. Al llegar estas personas a la próxima esquina de Tanca y San Francisco ocurrió la explosión y ambos volvieron atrás hacia el sitio del fuego. Otro testigo que vivía cerca del negocio se levantó al oír gritos y al cerciorarse que el fuego era en los Almacenes Palóu corrió a su residencia a notificárselo. Lo atendió la señora Palóu en la puerta en presencia del empleado del edificio que lo llevó hasta el apartamiento. Ambos declararon que durante unos cinco minutos en que estuvieron dándole la información no vieron allí ni consiguieron a Palóu. Tampoco el empleado lo vió bajar del apartamiento por lo menos durante los diez minutos siguientes. El guardián del solar de la Parada 25 donde la tarde anterior Palóu obtuvo prestado el automóvil Oldsmobile manifestó que éste dejó el carro en el referido solar como a las cinco de la mañana, algún tiempo después del testigo haber oído pasar las bombas de incendio en dirección hacia San Juan, y que Palóu le entregó las llaves del vehículo. La cajera del negocio dijo que ella y Palóu eran las personas que tenían llaves del candado y de otra cerradura de la puerta de entrada, pero que ella no volvió a abrir el local después de cerrarlo la tarde anterior. Mientras Palóu se encontraba el día 15 en el Cuartel de la Policía en el curso de la investigación comenzada sobre el incendio, le expresó al detective Gueits quien le era conocido: "en que lío me he metido, ayúdame en lo que puedas." Tres días después, el domingo 18, fecha en que arrestaron a Batalla, Palóu le pidió a Gueits que hablara con sus compañeros para que no le hicieran daño. Quedó probado que Palóu no hizo reclamación bajo la póliza de seguro por la pérdida de la mercancía.

En el turno de la prueba de descargo la defensa sentó a declarar al policía Víctor M. Matos, testigo citado por el Fiscal a quien no utilizó. Según dijo él escampaba unas lloviznas en la puerta de la Optica Sixto Pacheco en la Calle Fortaleza a unas 25 yardas de la esquina Tanca, siendo el primer agente en llegar al sitio del fuego al ocurrir la explosión. Manifestó que como a los 15 ó 20 minutos, cuando aún no habían llegado los bomberos, Palóu se presentó allí guiando la guagua comercial de su negocio, marca Pontiac, color "brown" y le preguntó al testigo si no había avisado a los bomberos ni llamado al Cuartel, pidiéndole entonces éste que fuera él al Cuartel a dar aviso. Palóu no siguió hacia el Cuartel sito en la Calle San Francisco sino que viró y se alejó en dirección de los muelles. La defensa entonces enseñó al testigo cinco fotografías admitidas en evidencia como prueba de cargo del automóvil Oldsmobile identificado en las mismas por Batalla como el vehículo que usaron al pegar fuego, para demostrar que no fué ese el carro en que llegó allí Palóu, y el testigo identificó luego la guagua que dijo manejaba Palóu en otro grupo de fotografías. Pero en el curso de su testimonio directo, Matos hizo referencia a una persona que resultó ser Francisco Robles García, a quien describió como un negrito que *estaba allí* que se acercó a atender el fuego, y durante el contrainterrogatorio, manifestó al Fiscal que el negrito le dijo: "Mírelo guardia, donde va el carro",(⁷) a lo que él respondió que a pie no lo iba a coger. El testigo identificó esa persona como la que aparecía señalando el Oldsmobile en una de las fotografías con que lo confrontó la defensa. De nuevo a preguntas de ésta, manifestó que cuando oyó decir "mírelo guardia, donde va el carro", vió un automóvil por la parte de atrás aunque

(⁷) La defensa se opuso a esta prueba por ser de referencia. El tribunal la admitió como parte del "res gestae". Considerando los demás factores y circunstancias que surgen de los autos en torno al sitio, forma y momento en que esta expresión se hizo, la misma era admisible. 6 Wigmore *on Evidence*, 3ª ed., sec. 1755; Cf: *American Law Inst. Model Code of Evidence.*—Rule 512; *Castro* v. *Hettinger & Co.*, 79 D.P.R. 884, 886 (1957).

no podía decir si era ese u otro. Matos admitió que estaban en el lugar del fuego Ventura Ortiz y su compañero. Ortiz, como hemos dicho, fué el testigo que identificó a Palóu guiando un automóvil en la esquina de Fortaleza y Tanca segundos antes de la explosión. La defensa trató de demostrar con el testimonio de su empleada doméstica que a la hora del fuego Palóu dormía en su cama; que Batalla fué visto por un vecino momentos después de la explosión mientras a paso ligero doblaba por el Callejón Gámbaro y seguía por Tetuán hacia el Banco Popular, contrario a la ruta que Batalla dijo haber seguido, y que a la fecha del incendio el negocio no estaba insolvente.

Sin duda alguna se produjo evidencia que tal como fué creída y apreciada por el tribunal a quo es suficiente para relacionar a Palóu con la comisión del delito, independientemente del testimonio del cómplice y del hecho en si del fuego, en la medida en que lo exige el art. 253 ya referido. El requisito de suficiencia de tal prueba es que la misma tienda a relacionar al acusado con el delito, y no tiene que ser ni robusta ni directa, sobre todo cuando el testimonio del cómplice se ha producido. Véanse: *Pueblo* v. *Portalatín*, 73 D.P.R. 334, 336 (1952); *Pueblo* v. *Portalatín*, 72 D.P.R. 152, 161 (1951); *Pueblo* v. *Baerga*, 70 D.P.R. 90, 93 (1949); *Pueblo* v. *Segarra*, 70 D.P.R. 484, 491 (1949); *Pueblo* v. *Rosario*, 68 D.P.R. 566, 571 (1948); *Pueblo* v. *Mejías (a) El Cubano*, 47 D.P.R. 282, 297 (1934); *Pueblo* v. *Sierra*, 42 D.P.R. 504, 506–07 (1931); *Pueblo* v. *Marrero (a) Moncho*, 41 D.P.R. 951, 959 (1931).

■■ Conscientes de las palabras con las cuales este Tribunal comenzó a exponer su opinión en *Batalla* v. *Tribunal de Distrito*, 74 D.P.R. 289 (1953) y en vista de la imputación de parcialidad, pasión y prejuicio en la apreciación de la evidencia hecha al magistrado que juzgó los hechos, y de la protesta de los abogados del apelante en el alegato al efecto de que no hubo un juicio imparcial debido al ambiente de prejuicio que alegan imperó en todo el transcurso del

proceso por lo cual piden acción correctiva y que ordenemos un nuevo juicio "en un ambiente de justicia real y no de mero formulismo preñado de pasión, prejuicio y parcialidad por parte de todos los funcionarios y del público mismo", repetimos ahora que con no menos escrupulosa minuciosidad hemos examinado la prueba que desfiló durante varias semanas de juicio para ver de cerciorarnos si dicha evidencia sostiene las sentencias condenatorias que pesan por el resto de su vida sobre este ofensor convicto, y si tuvo un proceso limpio de acuerdo con las garantías constitucionales que le protegen. La prueba según fué creída y apreciada por el tribunal a quo, y los autos no presentan justificación alguna para que intervengamos con tan delicada y subjetiva función que corresponde por excelencia al juez de primera instancia, (8) convence una conciencia de juzgador, más allá de duda razonable y fundada como debe de serlo, de que el apelante Miguel A. Palóu planeó el incendio de su establecimiento comercial y lo realizó en la madrugada del 15 de diciembre de 1949. Tenemos igual certeza que la imputación a la Sala sentenciadora de parcialidad, pasión y prejuicio en la apreciación de la evidencia, que a nuestro entender constituye más que la de un error de derecho la imputación de una actitud básicamente reñida con el concepto de un juicio justo, Cf: *Pueblo* v. *Jiménez*, 78 D.P.R. 7; *Cordero* v. *Rivera*, 74 D.P.R. 586, es totalmente infundada. A lo largo de las páginas de la extensa transcripción de los procedimientos surge un juicio justo e imparcial, y un juez libre de prejuicio que protegió en todo momento los derechos del acusado.

■ Establecida la intervención de Palóu en el fuego como cuestión de hecho, debe habérsele probado, en las circunstancias de este caso, la comisión de un delito de incendio malicioso en todos sus elementos esenciales, si han de sostenerse

---

(8) Cf: *Pueblo* v. *Aquino*, 79 D.P.R. 18; *Pueblo* v. *Garcés*, 78 D.P.R. 102; *Pueblo* v. *Piñeiro*, 77 D.P.R. 531; *Pueblo* v. *Comas*, 75 D.P.R. 413; *Pueblo* v. *Millán*, 71 D.P.R. 440; *Pueblo* v. *Blanco*, 68 D.P.R. 932.

las acusaciones de asesinato en primer grado. Cf: *People* v. *Ballentine*, 39 Cal.2d 193, 246 P.2d 35; *People* v. *Coefield*, 37 Cal. 2d 865, 236 P.2d 570; *People* v. *Cavanaugh*, 44 Cal.2d 252, 282 P.2d 53, cert. den. 350 U.S. 950; *People* v. *Amaya*, 40 Cal.2d 70, 251 P.2d 324.

 Arguye el apelante que la declaración de Batalla, único testimonio sobre el particular, demostró sólo la intención de quemar la mercancía asegurada y una violación del art. 478 del Código Penal, 33 L.P.R.A. sec. 1901, ausente la intención de destruir el edificio, y no la comisión de un incendio malicioso bajo el art. 398, siendo por lo tanto las muertes, en todo caso, asesinato en segundo grado.

Incuestionablemente, el motivo en este caso fué destruir por fuego la mercancía y cobrar la póliza, pero ese motivo formó la intención de destruir el edificio. Para constituir un incendio a los efectos del delito de incendio malicioso no es necesario, según reza el art. 402, 33 L.P.R.A. sec. 1565, que el edificio quede destruído, siendo suficiente con pegarle fuego de modo que prenda en cualquier parte del material del mismo. Cf. *Pueblo* v. *Valentín*, 75 D.P.R. 836; *People* v. *Hays*, 101 Cal. App. 2d 305, 225 P.2d 600; *O'Brien* v. *State*, 6 P.2d 421. La intención de destruir a que se refiere el estatuto, es la intención de quemar. Curtis, *The Law of Arson*, secs. 63, 83; Cf: *Rogers* v. *State*, 48 P.2d 344.

Los medios calculados que usó el apelante impregnando con una substancia volátil y sumamente inflamable todo el interior de la planta baja del edificio, probó palpablemente una intención de quemarlo. Como condición subjetiva que es, una intención específica se manifiesta por los medios, forma y circunstancias en que se realiza un acto. Cf: *Pueblo* v. *Tribunal*, 74 D.P.R. 838; *Pueblo* v. *Garcés*, 36 D.P.R. 270; *Pueblo* v. *Alegría*, 36 D.P.R. 393; *Pueblo* v. *Bianchi*, 18 D.P.R. 576; *People* v. *Ross*, 105 Cal. App.2d 235, 233 P.2d 68. Véase: *People* v. *Goldvarg*, 346 Ill. 398, 178 N.E. 892. En este caso, muy similar al de autos, se incendió aplicando gasolina dentro de un local que tenía paredes de

ladrillos, causándose una explosión que derribó una pared y extendió el fuego hasta otra parte del edificio en que había seres humanos. Se dijo que la mezcla de los vapores de gasolina con el aire dentro del sitio formó un ingrediente explosivo de tal potencia que ninguna pared podía resistir el impacto de tal explosión. Se recordará que el químico en este caso manifestó que la mezcla explosiva que formó el combustible con el aire era capaz de destruir el edificio.

No obstante toda la malicia premeditada que se albergó en el corazón y en la mente del apelante en su funesto designio, la prueba no demuestra que él y sus cómplices concibieran, y actuaran con, una intención específica, con propósito deliberado, de privar de la vida a aquellas víctimas de unas conciencias cegadas más bien por el egoismo material. A pesar de ello, probado que el apelante perpetró un incendio malicioso, la muerte de las personas que ocupaban las plantas altas del edificio motivada, según se estipuló, por las extensísimas y profundas quemaduras a consecuencia del fuego, constituye asesinato en primer grado por fuerza y mandato del art. 201 del Código Penal.[9] *State* v. *Fouquette*, 221 P.2d 404; *Whitfield* v. *Commonwealth*, 128 S.W.2d 208; *State* v. *Glover*, 50 S.W.2d 1049, *Anno*. 87 A.L.R. 414; *People* v. *Machado*, 309 P.2d 903; *People* v. *Morlock*, 292 P.2d 897; *People* v. *Osborn*, 231 P.2d 850,

---

[9] A la luz del reexamen que hicimos en *Pueblo* v. *Méndez*, 74 D.P.R. 913 y *Pueblo* v. *Blanco*, 77 D.P.R. 767, de los elementos mentales del asesinato, bajo los hechos de este caso la muerte podría caracterizarse como asesinato en segundo grado a no ser por el mandato expreso contenido en el art. 201 para que sea de primer grado. El concepto penal encarnado en este mandato conocido familiarmente en la jurisprudencia anglosajona como "felony murder", ha sido y es fuertemente atacado, principalmente en Inglaterra, y se ha tildado de rudo y medioeval, y de ser un residuo anacrónico de la era en que se castigaban los actos sin miras a la intención del delincuente. La crítica se basa fundamentalmente en que este concepto penal, adoptado originalmente en Pennsylvania en 1794 al dividirse por primera vez el asesinato en grados, ignora y a la vez subvierte el principio básico de la culpabilidad fundada en el estado mental con que se comete un crimen (*mens rea*) y el principio del castigo en proporción a la culpabilidad. Según se aduce, el asesinato en primer grado requiere un estado mental más específico que la malicia premeditada porque la voluntariedad, la premeditación y la deliberación

37 Cal.2d 380; *People* v. *Coefield*, 236 P.2d 570; *Southworth* v. *State*, 125 So. 345; *Commonwealth* v. *Lowry*, 98 A.2d 733; *People* v. *Witt*, 148 Pac. 928; *People* v. *Hadly*, 165 Pac. 442; *People* v. *Perry*, 94 P.2d 559, Cf: *People* v. *Cabaltero*, 87 P.2d 364. Véase: *Green* v. *United States*, 218 F.2d 856, donde bajo una disposición del Distrito de Columbia similar al art. 201, *D. C. Code* 1951, sec. 22–401, se sostuvo que era errónea una instrucción de asesinato en segundo grado demostrando la prueba una muerte en la perpetración de un incendio malicioso, y que sólo procedía en tal caso convicción de asesinato en primer grado o absolución. [Una segunda apelación en este caso, 236 F.2d 708, de asesinato en primer grado fué revocada por razón de exposición anterior ("jeopardy") en 355 U.S. 184, 2 L. Ed. 2d 199.]

█ Los restantes tres errores no requieren gran discusión. En el cuarto se alega error perjudicial al admitirse en evidencia una declaración prestada por Palóu al Fiscal el día 15 de diciembre de 1949 sin que se le hicieran advertencias, y que el error no fué subsanado al eliminarse la misma de los autos más tarde. Palóu estaba ante el Fiscal en calidad de testigo, no como acusado, en los comienzos de la investigación del incendio. Así lo determinó el propio Tribunal Superior por sentencia firme de 16 de diciembre

que lo distinguen constituyen una combinación particularísima evidenciaria de un propósito específico de matar un ser humano. Causa preocupación adicional la tendencia a ampliar dicho concepto del asesinato, de la cual decisiones tales como las de *Commonwealth* v. *Almeida*, 362 Pa. 596, 68 A.2d 595 (1948); *Commonwealth* v. *Bolish*, 381 Pa. 500, 113 A.2d 464 (1955); *Commonwealth* v. *Thomas*, 382 Pa. 639, 117 A.2d 204 (1955), constituyen buen ejemplo. No es nuestra intención exponer, ni mucho menos discutir, tan complejo problema en este momento, ni es nuestra misión aquí ahora la del reformador del derecho, sino la de aplicar la ley tal como nos ha sido dada. Hacemos el apuntamiento, sin ánimo de expresar juicio o criterio, porque precisamente estamos en proceso de adoptar nueva legislación penal. Como una orientación inicial del problema, véanse: *Felony Murder as First Degree Offense: An Anachronism Retained*, 66 Yale L. J. 427; Arent: *Felony Murder Doctrine*, 20 Cornell L. Q. 288; *Recent Extensions of Felony Murder Rule*, 31 Indiana L. J. 534, y las autoridades y bibliografía que citan.

de 1949, en el recurso de hábeas corpus (número 243) tramitado por él. El Fiscal le informó que se investigaba el fuego de su establecimiento y le preguntó si estaba en disposición de ayudarlo a esclarecer los hechos, a lo cual Palóu dijo que sí. Eliminada la declaración de los autos antes de someterse el caso, que fué ante tribunal de derecho, no hay por qué discutir el alegado error de su admisión. Sólo diremos que la referida declaración no es una confesión ni tampoco resulta ser inculpatoria, ni contiene elemento alguno de prueba sin el cual el juez no hubiera podido llegar a la misma conclusión de culpabilidad a que llegó a la luz de toda la evidencia, por lo que el hecho sólo de que se enterara de su contenido, aun cuando la declaración en un principio fuera inadmisible, no resultó en perjuicio alguno al apelante.

▇ El quinto error gira en torno a la admisión en evidencia de una llave. El teniente de la policía Alejandro Oliveras a cargo esa noche del Cuartel de San Juan declaró que había recogido durante el fuego en la acera opuesta del edificio un candado abierto que cerró para acomodárselo en el bolsillo. Se le mostró un candado identificado ya por Batalla, y luego por la cajera del negocio, como el de la entrada del establecimiento, y Oliveras reconoció ser el mismo. Manifestó entonces que estando Palóu en el Cuartel el día 15 de diciembre el teniente Soto le preguntó si él tenía la llave de aquel candado a lo cual Palóu dijo que sí sacándola de un llavero y el candado fué abierto allí mismo. Algo similar ocurrió con la empleada del negocio quien durante la investigación entregó al Fiscal la llave que ella poseía de ese candado, y se admitió la misma como prueba en el curso de su declaración en corte. Al ofrecerse en evidencia la llave en relación con el testimonio de Oliveras la defensa se opuso alegando que se había forzado a Palóu, sin advertencias de que podía usarse en su contra, a realizar un hecho contrario a su voluntad obligándolo a incriminarse. La contención del apelante carece enteramente de base. Ni

de la declaración de Oliveras surge o se infiere elemento alguno de coacción o de involuntariedad, ni el apelante produjo prueba en contrario demostrativa de que los hechos no ocurrieran en la forma expresada por el testigo. Por otra parte, era un hecho presumible que Palóu tuviera llaves de su propio establecimiento al cual tenía acceso legítimo. Es innecesario pues, que discutamos la cuestión de autoincriminación alegada, ya como problema de admisibilidad de evidencia a la luz de la protección constitucional contra la incriminación forzada, o ya como el problema de inmunidad a tenor de la Ley 13 de 9 de abril de 1941, discutido en el alegato del apelante. Cf: *Batalla* v. *Tribunal*, supra.

El sexto error imputa al tribunal sentenciador el haber permitido a Palóu renunciar al jurado a través de su representación legal, sin que el juez obtuviera una renuncia inteligentemente hecha después de un adecuado interrogatorio. El planteamiento no se sostiene a la luz de nuestras decisiones, sobre todo en ocasión de este caso en que el juicio por jurado era un privilegio no elevado aún a la categoría de derecho constitucional. *Pueblo* v. *Hernández*, 55 D.P.R. 954; *Ramos* v. *Rivera*, 68 D.P.R. 548; *Pueblo* v. *Berenguer,* 59 D.P.R. 81; *Pueblo* v. *Plata*, 43 D.P.R. 464; *Pueblo* v. *Figueroa*, 77 D.P.R. 188; *Pueblo* v. *Tosado*, 77 D.P.R. 434; *Pueblo* v. *Santiago*, 78 D.P.R. 69.

Pasamos finalmente a las convicciones de atentado a la vida. Las acusaciones por este delito, similares a las de asesinato, expresan que los acusados con malicia premeditada, deliberación, con intención y propósito decidido y firme de matar . . . . *"intentaron dar muerte ilegal al ser humano* [nombre] *sin lograr realizarlo, al perpetrar* . . . . un *Incendio Malicioso en Primer Grado en el edificio habitado* . . . . *."*

Los arts. 217 al 221 del Código Penal, 33 L.P.R.A. secs. 731–735,([10]) bajo el encabezamiento de "Atentados Contra

_____

([10]) Incluyen el administrar a otra persona substancia o poción nociva o mortífera con el propósito de matar sin que resultare muerte (art. 217); la agresión a otra con intención de cometer asesinato (art. 218) y los

la Vida" en la traducción española, y de "Atentados para Matar" en la versión original inglesa, estatuyen una serie de actos específicos considerados como tales atentados o tentativas para matar, entre los cuales no se menciona la perpetración de un incendio malicioso.

Un incendio malicioso puede ser el medio del cual se valga una persona que tenga hecho el propósito de matar a otra, pero tal no es la situación en este caso. Estatutariamente no existe una disposición sobre atentado a la vida o tentativa de asesinato en relación con un ser humano que sufra daños o su vida peligre en la perpetración de un incendio malicioso similar a la del art. 201 declarando asesinato en primer grado la muerte ocurrida al realizarse el mismo aun cuando, según las decisiones y autoridades citadas, ésta sea meramente accidental o no intencionada. Así pues, las acusaciones de atentado a la vida han de fundarse, o en la disposición específica del art. 218, 33 L.P.R.A. sec. 732—la agresión a otra persona con intención de cometer asesinato asumiendo aquí que la agresión pudo ser el acto de pegar fuego—o en la disposición del art. 50, 33 L.P.R.A. sec. 96, que castiga los delitos en grado de tentativa, en este caso, tentativa de asesinato. Aunque existe alguna diferencia, no siempre fácilmente distinguible entre esas dos modalidades estrechamente relacionadas del asesinato frustrado, es un principio axiomático de derecho que ambas requieren la intención específica de matar, de privar de la vida como propósito final, concebida ya al comenzarse a ejecutar un acto, bien a tenor del propio lenguaje del art. 218, o bien porque todo delito en grado de tentativa requiere la intención específica de cometer aquel delito por cuya tentativa se acusa, y no otro. En ambas de esas modalidades se *intenta* la comisión de un asesinato que es *dar muerte ilegal*, matar, mediando malicia premeditada. Tal intención específica de

actos relacionados con vías férreas y puentes descritos en el art. 219. Nuestro código incluyó además los referidos en los arts. 220 y 221, aunque en California éstos aparecían (secs. 346 y 347) bajo el epígrafe de "otros Daños a Personas", y no como tentativas para matar.

matar en el atentado a la vida debe ser probada como cuestión de hecho, más allá de duda razonable. Como condición subjetiva puede desprenderse de los hechos y demás circunstancias probados, pero no cabe presumir tal intención bajo la doctrina de que toda persona intenta los actos que voluntariamente y a sabiendas realiza, o que intenta las consecuencias naturales y probables de sus actos. Véase: *Pueblo* v. *Gómez*, 14 D.P.R. 127 (1908); *Pueblo* v. *Tribunal de Distrito*, 74 D.P.R. 838, 855 (1953); *People* v. *Lyles*, (Cal.) 319 P.2d 745; *People* v. *Bowlby*, (Cal.) 287 P.2d 547; *State* v. *Westbrook*, (Ariz.) 285 P.2d 161; *People* v. *Gallardo*, (Cal.) 257 P.2d 29; *People* v. *Shields*, (Ill.) 127 N.E.2d 440; *People* v. *Van Buskirk*, (Cal.) 249 P.2d 49; *People* v. *Grant*, (Cal.) 233 P.2d 660; *Keith* v. *State*, (Ark.) 235 S.W.2d 539; *Beall* v. *State*, (Md.) 101 A.2d 233; *Bowen* v. *State*, (Ala.) 26 So.2d 205; *Wesley* v. *State*, (Tex.) 198 S.W.2d 103; *People* v. *Carter*, (Ill.) 102 N.E.2d 312; *Shanks* v. *State*, (Ga.) 57 S.E.2d 357; *White* v. *State*, 13 Tex. App. 259; *People* v. *Surles*, (N.C.) 52 S.E.2d 880; *People* v. *Snyder*, (Cal.) 104 P.2d 639; *People* v. *Mize*, 22 Pac. 80; *State* v. *Mazzadra*, (Conn.) 109 A.2d 873; *People* v. *Miller*, (Cal.) 42 P.2d 308, *Anno.* 98 A.L.R. 918; 1 Wharton's *Criminal Law*, 12ª ed., sec. 215, 841.

La prueba del Pueblo no demostró, mucho menos más allá de duda razonable, que al momento de pegar fuego el apelante albergara la intención específica de matar, como un designio y propósito final. Surge de esa misma prueba que el plan de quemar se concibió bajo el supuesto, por desgracia erróneo, de que las personas que habitaban las plantas altas del edificio no correrían peligro dada la construcción del mismo y la falta de comunicación directa entre el local incendiado y dichas otras dependencias. Ello no sería impedimento para una convicción de asesinato por las muertes ocurridas, en primer grado, bajo la disposición del art. 201, o en segundo grado en ausencia de tal disposición, ya que éste último puede cometerse sin prueba de una intención

390

específica deliberada de matar. Cf: *Pueblo* v. *Méndez* y *Pueblo* v. *Blanco*, supra; Burdick, *The Law of Crime*, Vol. 1 sec. 139. La ausencia de tal intención específica sí impide una convicción de atentado a la vida.

*Las ocho sentencias de asesinato en primer grado serán confirmadas. Se revocan las dos sentencias de atentado a la vida.*